# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3149

_____

Kelvin Ray Love,                          *
                                          *
              Appellee,                    *     Appeal from the United States
                                          *     District Court for the Eastern
v.                                        *     District of Arkansas
                                          *
M.D. Reed, G. David Guntharp, and         *
Bruce Collins,                            *
                                          *
              Appellants.                  *

_____

Submitted:  April 14, 2000
Filed: July 5, 2000

_____

Before WOLLMAN, Chief Judge, BEAM, Circuit Judge, and FRANK,[1] District
    Judge.

_____

FRANK, District Judge.

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the
District of Minnesota, sitting by designation.

Appellants, all agents of the Arkansas Department of Corrections,[2] appeal from the district court's[3] ruling that appellants violated appellee's First Amendment right to free exercise of religion by failing to provide him with food in his cell on his Sabbath. We affirm.

## I.

Appellee Kelvin Ray Love ("Love") is an inmate in the Arkansas Department of Corrections ("ADC"). When he was incarcerated in 1982, Love identified his religion as "Catholic." During the course of his incarceration, however, Love's religious beliefs have changed.

Now, Love is a self-proclaimed adherent of the "Hebrew religion"[4]; although Love does not necessarily consider himself at this point to be Jewish–indeed, he does not formally ascribe to any organized religion–he is a student of the Old Testament

---

[2]According to the Amended Complaint, Joint Appendix at 11, M.D. Reed is the Warden of Cummins Unit of the ADC, Bruce Collins is the Assistant Warden of Operations for Cummins Unit, and David Guntharp is a Deputy Director of ADC.

[3]The Honorable Henry L. Jones, Jr., United States Magistrate Judge for the Eastern District of Arkansas, who presided over the case pursuant to the consent of the parties. See 28 U.S.C. § 636(c).

[4]The record indicates that Love has tried on several occasions to change his official religious designation, but he has been unable to do so because of a variety of procedural problems, such as his failure to use the proper forms or to have his request notarized. In addition, the Administrator of Religious Services for the ADC testified that he could not find "Hebrew religion" on any list of recognized religions. He further testified that, if Love would request it, he would arrange a meeting between a Rabbi and Love to ascertain whether Love's belief system could be relabeled in such a way that it would correspond with the list of recognized religions–a suggestion which Love has indicated he would "embrace" and "appreciate." J.A. at 183.

of the Christian Bible, and his religious beliefs derive from his own interpretation of that text.  Love explained his situation during a hearing before the district court:

> Q: You use a text that others use?
>
> A: Yes, sir.
>
> Q: But you've given it – you have a [sic] interpretation that is not a tenet of other religions; is that what –
>
> A: Due to the fact that I don't have anybody to teach me the true doctrines.  I'm – I'm learning on my own so I have to learn precept by precept.
>
> And really, I'm trying to practice the old Hebrew religion and I'm going by the King James Version which has been translated and re-translated and misinterpreted  . . . .

Joint Appendix (hereinafter "J.A.") at 50.  In short, Love has indicated his desire to return to first principles, religiously speaking, by studying the Old Testament.  He is skeptical of Christian interpretations of this text–indeed, he is skeptical of Christian *translations* of this text, but has been unable to obtain a Hebrew Bible–and has had no opportunity to study or discuss the text with adherents to any Jewish sects.  While Love has corresponded with the Jewish Prisoners Service International about issues such as Kosher standards, he has no source of regular religious instruction on Judaism.  As a result, Love has endeavored to interpret the plain language of the Old Testament himself.

From his study of the Old Testament, Love has concluded, among other things, that it is wrong to leave his residence or to work on the Sabbath,[5] a period which he

---

[5]Love cites *Exodus* 16:23 ("And he said unto them, This is that which the Lord hath said, Tomorrow is the rest of the holy sabbath unto the Lord: bake that which ye will bake today, and boil that ye will boil; and that which remaineth over lay up for
(continued...)

considers to run from sundown on Saturday to sundown on Sunday. Love's belief about resting on the Sabbath extends to a belief that he should not benefit from work others perform on the Sabbath.[6] As a result, the district court found that Love believes that he "is neither permitted to eat food prepared by others on the Sabbath, nor to have others serve him through their work on the Sabbath." J.A. at 236. To accommodate these beliefs, Love requested in late 1995 that the ADC provide him with peanut butter and bread in his cell on Saturday so that he might prepare sandwiches to consume in his cell on the Sabbath.[7] The ADC has allowed Love to forego cafeteria meals on his Sabbath. However, citing concerns about cell cleanliness and existing contraband rules, the ADC declined to provide Love with food from the prison kitchen for his Sabbath meals.

---

[5](...continued) you to be kept until the morning.") and *Exodus* 16:29 ("See, the Lord hath given you the sabbath; therefore he giveth you on the sixth day the bread of two days. Abide every man in his place, let no man go out on the seventh day."). Because Love has testified that he studies the King James Version of the Old Testament, we have used that version for our references.

[6]Love cites *Exodus* 20:10 ("But the seventh day is the sabbath of the Lord thy God; in it thou shalt not do any work, thou, nor they son, nor thy daughter, thy manservant, nor thy maidservant, nor thy cattle, nor thy stranger that is within thy gates . . . ."). Both Love and some of the prison guards testified that Love does not solicit any labor from anyone on the day he recognizes as the Sabbath; one guard admitted that Love will not even ask a guard to turn off a light for him as that would interfere with the guard's "rest."

[7]Appellants have indicated that Love is free to purchase pre-packaged food in the commissary for consumption on the Sabbath. However, the district court found that Love is indigent and does not always have money to purchase such luxuries. As Love himself put it, the food is there to be purchased but "it's just like rain is in the clouds . . . ." J.A. at 64.

Love filed an action in district court pursuant to 42 U.S.C. § 1983, alleging violation of his right to free exercise of religion as guaranteed in the First Amendment to the United States Constitution. Following a trial, the district court concluded that the ADC's refusal to accommodate Love by providing him with sandwich makings on Saturday did constitute a violation of Love's constitutional rights.

The prison officials now appeal, alleging: (1) that Love's belief system is not a "religion" so as to be protected by the First Amendment; (2) that, even if the Court finds Love's beliefs to constitute a religion, the ADC's rules do not impinge upon Love's free exercise of that religion; and (3) that, even if the Court finds that the ADC's policies impinge upon Love's free exercise of religion, those policies are reasonably related to a legitimate penological interest and therefore should be sustained.

We review the district court's factual findings under the "clearly erroneous" standard; the district court's legal conclusions are reviewed *de novo*. See Paramount Pictures Corp. v. Metro Program Network, Inc., 962 F.2d 775, 777 (8th Cir. 1992). We affirm the district court and find that the ADC's policies do constitute an infringement of Love's constitutional rights.

## II.

We first consider whether the district court erred in finding that Love's beliefs constitute a sincerely held religious belief protected by the First Amendment. "The appellants do not doubt that appellee's beliefs are sincere, but only that his belief system as described in the record should not be considered a religion." Appellants' Brief at viii.

First Amendment protection only attaches to beliefs rooted in religion, as opposed to purely secular beliefs or personal preferences. See Thomas v. Review

Board of the Indiana Employment Security Division, 450 U.S. 707, 713 (1981); Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996). "The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task . . . . However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas, 450 U.S. at 714.

The ADC cites Africa v. Commonwealth of Pennsylvania, 662 F.2d 1025 (3rd Cir. 1981), as defining three "useful indicia" of a religion for the purposes of First Amendment jurisprudence:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

662 F.2d 1025, 1032. Using these indicia as a benchmark, the ADC asserts that Love's belief system does not constitute a religion.

First, we note that, while the Third Circuit emphasized the importance of setting some objective guidelines, they also conceded that they did not intend to articulate a rigid "test" for defining a religion and that "'[f]lexibility and careful consideration of each belief system are needed.'" Africa, 662 F.2d at 1032 n.13 (quoting Malnak v. Yogi, 592 F.2d 197, 207-210 (3rd Cir. 1979) (concurring opinion)). Yet even applying the Africa standards as a "test," we find that Love's belief system is a religion.

-6-

With respect to the first two prongs of this analysis, Love's belief system is derived from his own study of a text which is central to two of the world's major religions: Christianity and Judaism. When asked to articulate the tenets of his belief system, Love confined his testimony to those tenets which affected this lawsuit; he was asked only about those beliefs that had some bearing on the lawsuit. J.A. at 47-48. However, he has clearly indicated that his religion is premised upon a fundamentalist approach to the Old Testament.[8] To suggest that the Old Testament of the Bible, standing alone as a religious text, fails to address "fundamental and ultimate questions having to do with deep and imponderable matters," or that it does not provide a comprehensive "belief-system as opposed to an isolated teaching" would be to call into question the "religiousness" of two of the most prominent religions in this country.

Love himself admits that his understanding of the tenets of his belief-system are evolving. However, "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707, 715 (1981). Here, Love concedes his is not an expert on the scriptures, even though he provided the district court with chapter and verse supporting his Sabbath meal request. While he may not yet be able to place individual precepts in a broader philosophical context, the record indicates that he is struggling in that direction–without the benefit of formal instruction. It is not the place of the courts to deny a man the right to his religion simply because he is still struggling to assimilate the full scope of its doctrine. We would not deny that a Jew's

---

[8]Indeed, Love strongly identifies with the Jewish faith. When asked whether he considered himself to be "Hebrew" or "Jewish," Love responded, "I don't consider there to be a difference between them." J.A. at 206. He went on to explain that he "wanted to go back to the 'A' priority [sic] origin of the religion and that is it. The founder of the Jewish religion was a Hebrew." J.A. at 206-207.

desire to keep Kosher is rooted in religion even if he were not a Rabbinical scholar capable of explaining the more subtle spiritual aspects of Judaism; similarly, we will not deny that Love's desire to follow the express dietary laws of the Old Testament is rooted in religion simply because he does not now attempt to draw more broad spiritual lessons from the text.

With respect to the third prong of the Africa analysis, the ADC suggests that Love has demonstrated only two formal or external signs which might be analogized to other traditional religions: his practice of not eating meals prepared or delivered on the Sabbath and his practice of not leaving his dwelling on the Sabbath. Love has not, they argue, offered evidence of "formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays [or] other similar manifestations associated with the traditional religions." Appellants' Brief at vii. We note, however, that Love is still attempting, through study and through correspondence with both the Jewish Prisoners Services International and the Alief Institute, to determine where his own beliefs fit with respect to Orthodox, Conservative, and Reform Judaism. Certainly, Judaism boasts formal services, ceremonial functions, a clergy, and structure and organization. Love himself does strictly observe a weekly "holiday" by keeping the Sabbath holy, and he has indicated that he would engage in other ceremonial behavior (such as ritual cleansing) if the strictures of prison life did not prevent it.

In short, we conclude that the district court correctly found that "[w]hile [Love] does not consider himself 'Jewish,' he does adhere to practices and teachings which are part of the Jewish faith." J.A. at 239. His beliefs may not fit squarely with the orthodoxy of Judaism, in any of its forms, but "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect," Thomas, 450 U.S. 715-716, and some allowance must be made for Love's isolation from a

source of formal instruction in Judaism.[9] To suggest that Love's belief-system falls short of being a religion would be to call into question the religious standing of all those who infuse Judaism, Christianity, or other "traditional" religions with personal interpretation and introspection. We are not inclined to do that. Accordingly, we find that the district court correctly held that Love's belief-system is a "religion" for purposes of First Amendment protection.

The ADC further argues that, even if Love's belief-system is religious in nature, his request regarding special meals on the Sabbath should not be considered a "religious preference." The ADC cites Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996), for the proposition that we should be more cautious in ascribing religious significance to requests or preferences which involve purely secular aspects of life, including "the timing of meals." However, this Court noted in Wiggins v. Sargent, 753 F.2d 663, 666-667 (8th Cir. 1985), that "a belief can be both secular and religious. The categories are not mutually exclusive. The first amendment presumably protects the area where the two overlap." Here, Love's meal request is supported by direct reference to a passage in his religious text. Again, it is difficult to distinguish between Love's Sabbath meal request and the Kosher laws of Judaism or the strictures the Islamic religion places on eating during daylight hours during Ramadan. Not only is Love's belief-system a "religion," but his preference for food not prepared or served on the Sabbath is a religious preference which falls within the ambit of the First Amendment.

---

[9]We note that members of the Jewish community might not consider Love to be Jewish, as he was apparently raised as a Christian and he has undergone no formal conversion. However, "the question whether [Love's] beliefs are entitled to Free Exercise protection turns on whether they are 'sincerely held,' not on the 'ecclesiastical question' whether he is in fact a Jew under Judaic law." Jackson v. Mann, 196 F.3d 316, 321 (2nd Cir. 1999).

# III.

Next we consider whether the ADC's refusal to provide food from the facility kitchen to Love on Saturday for consumption on Sunday substantially burdens Love's ability to freely exercise his religion. The ADC argues that it does not. Specifically, they note that Love is free to purchase food from the commissary or to fast on the Sabbath; the ADC does not *force* Love to violate his religious convictions by eating food prepared or served on the Sabbath.

With respect to the ADC's claim that Love can exercise his religion on the Sabbath by buying pre-packaged food in the commissary, the district court found that Love is indigent and does not generally possess the funds to buy food. The district court's finding regarding Love's indigency is not clearly erroneous. Moreover, the district court concluded that Love was obligated to spend any money he did obtain for food from the commissary for observance of his Sabbath; however, to the extent that Love does not, in a particular week, have money for purchasing food from the commissary, the ADC should provide him with food on Saturday. In other words, the district court's ruling requires Love to exhaust alternative means of observing the Sabbath before seeking an accommodation from the ADC.

Finally, we reject the ADC's apparent contention that Love's option of fasting on his Sabbath–as he has been doing–abrogates their obligation to accommodate his religious dietary requirements. We agree with the Second Circuit's recent pronouncement that prison inmates are entitled to reasonable accommodation of their religious dietary needs. Jackson v. Mann, 196 F.3d 316, 320 (2nd Cir. 1999). Giving Love the option of fasting is not a reasonable accommodation of his religious dietary needs. At a minimum, Love has indicated that fasting interferes with his ability to appropriately celebrate his Sabbath. As he explains his religious beliefs, the Sabbath is intended as a day of rest and refreshment; fasting is a practice reserved for days of mourning and atonement. An enforced fast on the Sabbath detracts from the joy of

the day.  J.A. at 189.  The choice the ADC would offer Love, between fasting and compromising his religious convictions, is really no choice at all.

We conclude, then, that Love has no consistent and dependable way of exercising his right to observe his Sabbath without the requested accommodation by the ADC.  The ADC's failure to provide the requested accommodation, then, substantially burdens Love's ability to freely exercise his religion.

**IV.**

Finally we turn to the issue of whether the ADC has shown a reasonable relationship between the policy which impedes Love's free exercise of religion and some legitimate penological interest.  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987).  In determining whether a regulation is reasonable, courts should consider:  (1) whether there is a valid, rational connection between the regulation and the interest asserted; (2) whether alternative means of exercising the right remain open to the prisoner; (3) the effect the requested accommodation will have on guards, other inmates, and the allocation of prison resources; and (4) whether there is some alternative which will accommodate the prisoner's needs with *de minimis* impact on the prison's asserted interests.  Id. at 89-91.

The ADC has identified two legitimate penological interests which it purports to advance by prohibiting Love's accommodation.  First, the ADC argues that "hoarding" of food from the kitchen would increase the probability of spoilage, thereby compromising the penological interest in maintaining a sanitary facility. Second, the ADC argues that if they extend this "privilege" to Love, other inmates will demand the same privilege, and the resulting discontent will compromise the

-11-

penological interests of security and order.  We do not find these arguments persuasive.

The ADC has repeatedly stressed that Love is free to buy food in the commissary for consumption at any time.  The ADC argues that the food available in the commissary is less prone to spoilage than food which comes from the kitchen and thus does not pose the same sort of health risk.  To that end, counsel for the ADC pointed out that beef jerky bought in the commissary is less likely to spoil quickly than a "hamburger steak" from the facility kitchen.  J.A. at 184.  While it is true that some kitchen food spoils more quickly than some commissary food, the opposite is also true:  an open can of pork and beans or unwrapped microwavable sandwich (from the commissary) would likely spoil more quickly than a loaf of bread and jar of peanut butter (from the kitchen).  Indeed, Love testified that loaves of bread were available from the commissary and thus could be purchased by prisoners, stored in their cells, and consumed at their leisure.  Love, himself, once purchased peanut butter in the commissary.  The type of food items Love has requested are not highly perishable items.  Rather, they are food items which could be, and likely are, stored in the cells of inmates with the funds to buy them from the commissary.  The ADC's argument, that providing these foods to Love a day in advance would create a potential health risk, rings hollow.

We also note that the ADC already makes exceptions to its rule by providing certain prisoners–those in segregation or observing religious holidays–with kitchen food in their cells.[10]  It is certainly foreseeable that crumbs and bits of that food would fall to the floor where it might spoil or attract bugs.

_____

[10]The ADC distinguishes those situations from Love's request by noting that the kitchen food brought to the cells is for immediate consumption.  Given that Love is requesting his food only a day in advance, the ADC appears to be drawing the proverbial distinction without a difference.

Certainly the ADC's interest in health and sanitation is legitimate. But a blanket prohibition on food from the facility kitchen is not reasonably related to that interest. If Love were requesting hamburgers, cartons of milk, or other highly perishable items on Saturday for Sunday consumption, the ADC's denial of his request might be justified. However, Love has requested only peanut butter and bread–items which are available in the commissary for other prisoners, with money, to purchase and store in their cells. The accommodation Love has requested poses no more of a threat to the prison's sanitation than do practices which are already common in the prison.

The ADC's second asserted penological interest is similarly unconvincing. The ADC suggests that providing Love with bread and peanut butter on Saturday, for consumption on Sunday, would open a floodgate of similar requests from other inmates. As the district court noted, it is "difficult to believe that most inmates would go to great lengths to obtain the same treatment as plaintiff; that is, to remain in a cell all day on Sunday with a couple of sandwiches to eat for a day, as opposed to leaving the cell for three hot meals in the cafeteria." J.A. at 241. Indeed, Appellant M.D. Reed testified: "[I]nmates usually prefer hot meals, you know, over a sandwich, in most cases. . . . [I]t would cause problems if I delivered sack lunches to administrative seg [sic]. I would say that the large part of that population would not be happy with it, and it would cause real problems." J.A. at 126.

The real concern, Reed testified, is that, if the ADC accommodates Love, other prisoners will request *other* accommodations of their dietary preferences. This justification for denying Love's accommodation is not persuasive. The same argument could be made with respect to the ADC's accommodation of the Islamic prisoners fasting during Ramadan: the fact that these prisoners get food brought to their cell after dark might prompt other inmates to want the same, or other, consideration. But as with the case of the Islamic prisoners, the key factor here is that Love's request is based upon his religious convictions. If other prisoners request

-13-

dietary accommodations based upon sincerely held religious beliefs, then the ADC has an obligation to consider their requests. If other prisoners request dietary accommodations which are based merely upon personal preference, the ADC will be under no obligation to provide those accommodations.

In short, we agree with the district court's holding that the ADC's refusal to accommodate Love's religious dietary needs is not reasonably related to a legitimate penological interest.

Turning to the remaining considerations in the <u>Turner</u> analysis, we have already discussed Love's lack of available alternative means of exercising his right to abide by his religious convictions with respect to his Sabbath meals. Moreover, we concur with the district court's assessment that:

> the impact of providing [Love] non-perishable food on Saturdays for his consumption on Sundays is minimal. Special dietary trays are prepared for inmates with other beliefs, and guards transport meals to inmates in other areas of the unit on a daily basis. Finally, . . . the provision of food to [Love] on Saturdays is an alternative [to the ADC's general policy] which "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests."

J.A. at 241-242 (quoting <u>Hamilton v. Schriro</u>, 74 F.3d 1545, 1551 (8th Cir. 1996)).

We conclude, then, that the ADC's policy infringes upon Love's sincerely held religious beliefs and that it is not reasonably related to any valid penological interest. Accordingly, the decision of the lower court is affirmed.

A true copy.

Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.