# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1862

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Charles Thomas Sell, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| - - - - - - - - - - - - - - - - - - - | * | |
| | * | |
| Association of American Physicians | * | |
| & Surgeons, Inc. | * | |
| | * | |
| Amicus on Behalf of Appellant. | * | |

_____

Submitted:  October 15, 2001

Filed:  March 7, 2002

_____

Before BOWMAN, HEANEY and BYE, Circuit Judges.

_____

HEANEY, Circuit Judge.

Appellant Dr. Charles Sell, D.D.S. is charged with health care fraud, attempted murder, conspiracy, and solicitation to commit violence. In this appeal, Sell

challenges the district court's[1] determination that he may be involuntarily medicated with antipsychotic drugs for the sole purpose of rendering him competent for trial. We affirm.

## I. Background

On May 16, 1997, Sell was charged in a federal criminal complaint with making false representations in connection with payments for health care services in violation of 18 U.S.C. § 1035(a)(2). The government alleged that Sell and his wife submitted false claims to Medicaid and private insurance companies for dental services not provided, including false documentation and bogus x-rays in support of these claims. On May 20, 1997, the government filed a motion for psychiatric examination of Sell to determine his competence to stand trial.[2] On May 20, 1997, a magistrate judge ordered that Sell be sent to the U.S. Medical Center for Federal Prisoners at Springfield, Missouri ("Springfield") for an evaluation. On July 15, 1997, after receiving a psychiatric evaluation from Springfield, the district court held that Sell was competent to stand trial. The report, which was accepted without objection, stated that Sell was currently competent to stand trial but that there was a possibility that he would develop a psychotic episode in the future. On July 30, 1997, an indictment was returned against Sell and his wife, charging them with fifty-six counts of mail fraud, six counts of medicaid fraud, and one count of money-laundering.

In August 1997, Sell was released on bond. On January 22, 1998, the government filed a bond revocation petition alleging that Sell had violated the conditions of his release by attempting to intimidate a witness. A warrant was issued

---

[1]The Honorable Donald J. Stohr, United States District Court for the Eastern District of Missouri.

[2] Sell has a history of mental illness.

for Sell's arrest and he was brought before a magistrate judge for an initial appearance.  Sell's behavior at this appearance was out of control. He screamed, shouted, and used racial epithets.  Nonetheless, the judge tried to proceed, but when she advised Sell of his rights, he leaned towards her and spit directly in her face.

On January 26, 1998, a bond revocation hearing was held, and shortly thereafter, the court ordered that Sell's bond be revoked and that he be detained.  At this hearing, the court received evidence that Sell's mental condition was deteriorating.  Sell was not sleeping at night because he expected the FBI to barge into his house.  A psychiatrist reported that Sell soon could become a danger to himself and others.

On April 23, 1998, Sell was charged in a second indictment with conspiring and attempting to kill a witness and an FBI agent.  The government contends that Sell and his wife asked a hit man to plot the murder of a former employee at his dental office who planned to testify against him on the fraud charges.  The government also alleges that Sell plotted to kill the African-American FBI agent who had arrested him. The two indictments were joined.

During the next several months, the trial date was continued on a number of occasions at the request of both parties.  On February 9, 1999, Sell's counsel filed a motion asking this court to hold a hearing to determine Sell's competency.  The government filed a separate motion to have a government psychologist examine Sell. Both Sell's psychologist and the government psychologist diagnosed Sell with delusional disorder, persecutory type.[3]

---

[3]Delusional disorder is characterized by the presence of one or more non-bizarre delusions that persist for at least one month.  Diagnostic and Statistical Manual of Mental Disorders IV at 296.  The delusions are generally plausible ideas that can conceivably occur in real life.  Id.   The persecutory subtype of delusional disorder is characterized by a person's belief that he is being conspired against,

On April 14, 1999, the district court held a hearing on Sell's competency. Upon consideration of the evidence, the court found that Sell was suffering from a mental disease or defect rendering him incompetent to assist properly in his defense, and thus incompetent to stand trial. The court ordered that Sell be hospitalized at Springfield for a reasonable period of time not to exceed four months to determine whether there was a substantial probability that Sell would attain the capacity to stand trial.

At Springfield, Sell was under the care of two clinicians, Dr. DeMier, the clinical psychiatrist, and Dr. Wolfson, the consulting psychiatrist. Both Dr. DeMier and Dr. Wolfson determined that Sell was in need of antipsychotic medication.[4] On

_____

cheated, spied on, followed, poisoned or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long term goals. Id. at 298.

[4]Justice Kennedy described antipsychotic medications in his concurring opinion in United States v. Riggins:

> First introduced in the 1950's, antipsychotic drugs . . . have wide acceptance in the psychiatric community as an effective treatment for psychotic thought disorders. See American Psychiatric Press Textbook of Psychiatry 770-774 (J. Talbott, R. Hales, & S. Yodofsky eds. 1988 (Textbook of Psychiatry); Brief for American Psychiatric Association as Amicus Curiae 6-7. The medications restore normal thought processes by clearing hallucinations and delusions. Textbook of Psychiatry at 744.

United States v. Riggins, 504 U.S. 127,141 (1992) (Kennedy, J., concurring). In Washington v. Harper, the Supreme Court discussed the side effects associated with antipsychotic medications:

> The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. (Citation omitted). While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects. One such side effect identified

June 9, 1999, an administrative hearing was held before a medical hearing officer. Dr. DeMier and Dr. Wolfson testified in favor of using antipsychotic medication in the treatment of Sell, and testified that it was the only way he could be restored to competency. Sell proffered the affidavit of his psychiatrist, Dr. Cloninger, who asserted that he did not think Sell would respond well to medication. Cloninger Aff. ¶¶ 8, 17. Sell also called a number of witnesses and testified that he did not want to take antipsychotic medication and have his chemistry altered. The medical hearing officer concluded that antipsychotic medication was the treatment of choice. This

---

by the trial court is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes. The trial court found that it may be treated and reversed within a few minutes through use of the medication Cogentin. Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs. See Finding of Fact 9, App. to Pet. for Cert. B-7; Brief for American Psychological Association as Amicus Curiae 6-9. Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face. See Mills, 457 U.S., at 293, n. 1, 102 S.Ct., at 2445, n. 1. The State, respondent, and amici sharply disagree about the frequency with which tardive dyskinesia occurs, its severity, and the medical profession's ability to treat, arrest, or reverse the condition. A fair reading of the evidence, however, suggests that the proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%. According to the American Psychiatric Association, studies of the condition indicate that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe. Brief for American Psychiatric Association et al. as Amici Curiae 14-16, and n. 12; see also Brief for American Psychological Association as Amicus Curiae 8.

Washington v. Harper, 494 U.S. 210, 229-30 (1990).

finding was based on the fact that his delusional thinking could make him dangerous and that no other drug could treat his delusional symptoms. Dr. Sell filed an administrative appeal that was denied. The Medical Center delayed the administration of the medication to give Sell the opportunity to seek review by the district court.

On September 29, 1999, a United States Magistrate Judge conducted a full judicial hearing. At that hearing, the Government called two witnesses, Dr. DeMier and Dr. Wolfson. They testified that Sell was in need of antipsychotic medication, that his condition would continue to deteriorate without it, that his behavior could be dangerous, and that antipsychotic medication was likely to restore him to competency. On August 9, 2000, the magistrate entered an order finding that Sell posed a danger to himself and others. United States v. Sell, No. 4: 98CR177, (E.D. Mo. Aug. 9, 2000) (order granting government's motion to involuntarily medicate defendant). Based on this finding, the magistrate authorized the government to forcibly medicate Sell with antipsychotic medication.

In April 2001, the district court reversed the magistrate's finding that Sell posed a danger to himself and others, noting that the evidence in the record was insufficient to support such a finding. Despite this reversal, the district court affirmed the magistrate's order, holding that the Government's interest in restoring Sell to competency so that he can stand trial was alone sufficient to warrant forcible medication.

Sell appeals this decision and asks this court to decide whether the district court erred in holding that he could be forcibly injected with antipsychotic drugs for the sole purpose of restoring his competency to stand trial. Sell also asks us to examine whether: (1) the district court applied the correct standard of review; (2) whether the district court properly considered his Sixth Amendment right to a fair trial, and (3) whether the government has proven by clear and convincing evidence

-6-

that the medication is medically appropriate and that the medication has a reasonable probability of restoring his competency. The Government argues that the district court did not err on these grounds. It further argues that the district court's finding that Sell was not dangerous was erroneous and that Sell's dangerousness provides an alternate grounds for affirmance in this case.

## II. Discussion

A.     Sell's Dangerousness to Himself and Others.

First, we consider the government's claim that the district court erred in overturning the magistrate's determination that Sell is dangerous. We review the district court's determination of questions of fact under the clearly erroneous standard. See United States v. Kissinger, 986 F.2d 1244, 1246 (8th Cir. 1993). The government argues that the district court did not give adequate weight to Sell's potential to be a danger to himself or others. The district court noted, however, that Sell's inappropriate behavior at Springfield amounted at most to an "inappropriate familiarity and even infatuation" with a nurse. Upon review, we agree that the evidence does not support a finding that Sell posed a danger to himself or others at the Medical Center. The district court properly reversed the magistrate's finding.

B. Forcible Administration of Antipsychotic Drugs to Restore Competency

Next, we consider the question of whether the district court erred in holding that a pretrial detainee may be forcibly injected with antipsychotic medication for the sole purpose of rendering him competent to stand trial. This is an issue of first impression for this court. Cf. Papantony v. Hedrick, 215 F.3d 863, 865 (8th Cir. 2000) (holding that in the context of a Bivens action, there is no clearly established right of a pre-trial detainee not to be forcibly administered antipsychotic drugs for the sole purpose of rendering him competent for trial). In Washington v. Harper, the Supreme

Court recognized that individuals possess "a significant liberty interest in avoiding unwanted administration of antipsychotic drugs." 494 U.S. 210, 221 (1990); cf. United States v. Weston, 255 F.3d 873, 876 (D.C. Cir. 2001) (citations omitted) ("The due process liberty interest in avoiding unwanted antipsychotic medication may be 'significant,' but it is not absolute."). In Harper, a convicted prison inmate claimed that the State of Washington violated his due process rights by administering antipsychotic drugs against his will. 494 U.S. at 217. The Court acknowledged that Harper had a liberty interest in avoiding unwanted medication but held that the "Due Process Clause permits the state to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if [the inmate] is dangerous to himself or others and the treatment is in [the inmate's] medical interest." Id. at 211.

In Riggins v. Nevada, the Court applied its Harper analysis to the issue of whether a pre-trial detainee may be forcibly injected with antipsychotic medication for the purpose of rendering him competent for trial. 504 U.S. 127 (1992). In Riggins, a pre-trial detainee was forcibly administered the antipsychotic drug Mellaril after a Nevada district court denied the detainee's pre-trial motion to terminate the medication with a one-page order that gave no indication as to the court's rationale. See id. at 130-31. A jury convicted Riggins,[5] and he appealed, arguing that the forced administration of Mellaril denied him the ability to assist in his own defense and prejudicially affected his attitude, appearance and demeanor at trial. See id. at 131. Riggins further argued that the prejudice was not justified because the state did not demonstrate a need to administer the drug, nor did it explore alternative treatments. The Supreme Court agreed, and held that Riggins's Fourteenth Amendment rights had been violated because the Nevada court did not acknowledge the detainee's liberty interest in freedom from unwanted medication, make any findings on the need for forced medication, and make findings on reasonable alternatives to antipsychotic

---

[5]At trial, Riggins unsuccessfully presented an insanity defense and was convicted of murder and sentenced to death.

medication. See id. at 136-37.  The Court also noted that forcible administration of antipsychotic drugs may have interfered with Riggins's Sixth Amendment right to a fair trial.  See id.  The Court, therefore, reversed and remanded the case.

The Supreme Court did not have the opportunity to determine when involuntary medication could be used on a pre-trial detainee because the Nevada court offered the accused almost no protection against involuntary medication.  The Supreme Court did note, however, that:

> Under Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness.  The Fourteenth Amendment guarantees at least as much protection to persons the state detains for trial. (Citation omitted).
>
> . . . Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the district court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. (Citation omitted). Similarly, the state might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means.

Id. at 135.

Based on this language, we conclude that subject to the limitations outlined below, the government may forcibly administer antipsychotic medication for the sole purpose of rendering a pre-trial detainee competent to stand trial without violating the accused's due process rights.

C.    The Standard of Review for Forcible Administration of Antipsychotic Drugs.

We now consider Sell's claim that the district court employed the wrong standard of review to determine whether forced administration of medication is appropriate in this case. Sell encourages us to adopt strict scrutiny, but the Supreme Court declined to adopt such a standard in Riggins. See Riggins 504 U.S. at 136.[6] Based on the Supreme Court's decision in Riggins and Harper, and the decisions of our sister courts,[7] we hold that the government must meet the following test in order

---

[6] The court stated: " We have no occasion to finally prescribe such substantive standards . . . since the District Court allowed administration of Mellaril to continue without making any findings about reasonable alternatives." Riggins, 504 U.S. at 136.

[7] Other courts have come to contradictory conclusions on what substantive standards are necessary to satisfy a pretrial detainee's due process rights. The Sixth Circuit held that courts must apply the strict scrutiny standard when the state wishes to forcibly medicate a non-dangerous pre-trial detainee. See United States v. Brandon, 158 F.3d 947, 960 (6th Cir. 1998). The D.C. Circuit interpreted Riggins to require "heightened scrutiny" that takes into consideration the severity of infringement that antipsychotic drugs impose on an individual's liberty interest, the need to find an essential state policy that provides an overriding justification for forced medication, and a requirement to consider less intrusive alternatives. See United States v. Weston, 255 F.3d 873, 880 (D.C. Cir. 2001). Similarly, the Southern District of California refused to adopt a strict scrutiny standard. Rather, it stated that the government must meet the following standard:

First, the government must demonstrate that "administration of anti-psychotic drugs is necessary to accomplish an essential state policy." (Citation omitted). Second, the government must show that "there is a sound medical basis for treatment with anti-psychotic medication." (Citation omitted). In making this showing, the government may provide "medical testimony regarding [Defendant's] mental illness and its symptoms as well as the effects that anti-psychotic medication will have, both beneficial and harmful, on [Defendant's] physical and mental

for the government to forcibly medicate an individual. First, the government must present an essential state interest that outweighs the individual's interest in remaining free from medication. See Riggins, 540 U.S. at 135 (noting that the government must prove an overriding state interest). Second, the government must prove that there is no less intrusive way of fulfilling its essential interest. See id. Third, the government must prove by clear and convincing evidence that the medication is medically appropriate. See id. Medication is medically appropriate if: (1) it is likely to render the patient competent, see Weston, 255 F.3d at 876; (2) the likelihood and gravity of side effects do not overwhelm its benefits, see id.; and (3) it is in the best medical interests of the patient. See Harper, 494 U.S. at 227 (noting that the court should consider the petitioner's medical interest). The district court did not explicitly apply this test, so we review the district court in light of the standards we have set forth.

The first question, therefore, is whether the district court erred by holding that the government's interest in bringing Sell to trial is sufficient to outweigh Sell's interest in refusing medication. This is a mixed question of law and fact, so we review the district court's finding de novo. See Boysiewick v. Schriro, 179 F.3d 616, 619 (8th Cir. 1999). To make this determination, we must weigh the government's

---

> health." Third, and most importantly, the government must establish "that there is no significant risk that the medication will alter in any material way the defendant's capacity or willingness to react to testimony at trial or assist counsel." (Citation omitted). [T]he government must establish these elements by clear and convincing evidence.

United States v. Sanchez-Hurtado, 90 F. Supp.2d 1049, 1055 (S.D. Cal. 1999). Like our sister courts, we believe that we must apply some sort of heightened standard of review, but unlike the Sixth Circuit, we do not adopt the strict scrutiny standard. See e.g. Weston, 255 F.3d at 888 (noting that the Supreme Court denied adopting a strict scrutiny test in Riggins but also appeared not to apply a reasonableness test or its various analogues: arbitrary and capricious, rational basis or exercise of professional judgment).

interest in rendering Sell competent against Sell's interest in refusing unwanted medication.

The government has an essential interest in bringing a defendant to trial. See Illinois v. Allen, 397 U.S. 337, 347 (1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and a prerequisite to social justice and peace."). Not all charges, however, are sufficient to justify forcible medication of a defendant; rather, the charges must be serious. See United States v. Brandon, 158 F.3d 947, 961 (6th Cir. 1998). Here, the sixty-two charges of fraud and the single charge of money-laundering are serious, a fact not denied by the defendant.[8] Despite Sell's significant liberty interest in refusing antipsychotic medication, in view of the seriousness of the charges, we believe that the government's interest in restoring his competency so that he may be brought to trial is paramount.[9]

The second part of our analysis is whether the district court erred in finding that there were no less intrusive means by which the government may achieve its essential interest. See Riggins, 540 U.S. at 135 (noting that the government must prove that there is no less intrusive means). The government may not constitutionally bring an incompetent defendant to trial, see Pate v. Robinson, 383 U.S. 375 (1966), so the only way the government may try Sell is by restoring his competency. Both Dr. Wolfson and Dr. DeMier testified that antipsychotic medication is the most

---

[8]Although Sell is also charged with conspiring to murder an FBI officer and a witness, we base our reasoning solely on the seriousness of the fraud charges. It is possible that Sell's threats after his first indictment were a manifestation of his delusional disorder and we decline to make a determination about whether those charges suffice to involuntarily medicate him.

[9]We note that the government's interest in preserving a scheme of ordered liberty can only be achieved if a defendant is competent at trial. If the medication does not render Sell competent, his trial cannot proceed. See infra Part II.D.

effective treatment for delusional disorder and that it is the only way Sell could be restored to competency.  See Transcript of Evidentiary Hr'g, Sept. 29, 1999 at 21, 75-78.  Even Dr. Cloninger, who submitted an affidavit on behalf of Sell and stated that antipsychotic drugs are not a proven treatment, did not suggest any alternative means of restoring competency.  See generally Cloninger Aff. Based on this evidence, we believe that the district court correctly concluded that there were no less intrusive means.

Third, we must determine whether the evidence supports the district court's conclusion that antipsychotic medication is medically appropriate for Sell's treatment. We review the district court's findings of fact under the clearly erroneous standard. See Love v. M.D. Reed, 216 F.3d 682, 687 (8th Cir. 2000).  Whether a proposed action is medically appropriate depends on the judgment of medical professionals. See Harper, 494 U.S. at 231, 233-34.  At the hearing before the Magistrate Judge, the government presented testimony from Dr. DeMier and Dr. Wolfson.  Dr. DeMier, Sell's treating psychologist, testified that antipsychotic medication is the only treatment that has been shown to be effective in treating delusional disorder and it is the only treatment that could restore Sell to competency.  He also stated that he has treated two patients suffering from delusional disorder with antipsychotic medication. Of the two, one was restored to clinical competency; the other patient improved, but did not regain competency.[10]  Dr. DeMier also stated that antipsychotic medications have "potentially significant side effects, but there's also potentially, very significant recovery from symptoms."

Dr. Wolfson, the staff psychiatrist who works as a consultant on Sell's case, also recommended that Sell be treated with antipsychotic drugs.  Dr. Wolfson has

---

[10]The patient who was successfully treated was given Haldol, a typical antipsychotic drug.  The patient who was not restored to competency received Olanzapine, an atypical antipsychotic drug.

treated seven patients with delusional disorder but only four for the purpose of restoring competency.[11] Dr. Wolfson reported that all seven benefitted clinically from antipsychotic medication and of the four who were treated for restoration of competency, three regained competency. Dr. Wolfson testified that the medical literature indicated that patients with delusional disorder respond less to medication than patients with other illnesses, but he stated that he doubts the accuracy of that conclusion and noted that the literature shows favorable results in many cases.[12] Dr. Wolfson admitted that there are both harmful and unpleasant side effects to antipsychotic drugs; these include sedation, neuroleptic malignant syndrome, which is rare but fatal,[13] and tardive dyskinesia and/or dystonic reaction, which causes a person to have involuntary movements of various parts of the body. Dr. Wolfson also stated, however, that the existence and/or degree of side effects could be controlled by changes in the doses and type of medication being used. He testified that the new generation of atypical antipsychotic drugs, such as Pimozide, have more benign side effects than the older typical antipsychotic drugs, such as Haldol. Dr. Wolfson admitted, however, that the atypical drugs can only be administered orally, and therefore cannot be used to forcibly drug uncooperative patients.

---

[11]He treated one of the patients twice. This patient was restored to competency, relapsed, then restored a second time.

[12]Dr. Wolfson explained that:

> First, the delusions stop expanding. . . . It's even conceivable that some delusional material may regress. . . . [O]ur first goal [is] to diminish the impact on . . . actions and . . . judgment of the illness. Second, [is] to minimize the expansion of the delusional system. . . . [I]t's typically been my experience [that this is] accomplished with other patients.

Transcript of Evidentiary Hr'g, Sept. 29, 1999 at 137.

[13]Dr. Wolfson testified that the incidence of this side-effect is one in ten thousand cases.

To combat this testimony, Sell presented the affidavit of Dr. Cloninger. Dr. Cloninger stated that "there is no evidence that [antipsychotic medications] are beneficial for patients with Delusional Disorder." Cloninger Aff. at 8. Dr. Cloninger admitted that antipsychotic drugs are often beneficial in treating schizophrenia but maintained that they do not provide the same benefit in the treatment of delusional disorder. Dr. Cloninger attached to his affidavit an excerpt from the American Psychiatric Press Textbook of Psychiatry. That text notes that there is a disagreement between experts on the effectiveness of treating delusional disorders with antipsychotic medication, but it also states that the medication may be useful, particularly for accompanying anxiety, agitation, and psychosis. Donald W. Black et.al., Schizophrenia, Schizophreniform Disorder, and Delusional (Paranoid) Disorders, in Textbook of Psychiatry (John A. Talbott et. al. eds.) 1988. Dr. Cloninger was not able to recommend a less intrusive alternative to restore Sell to competency; rather, he suggested that treatment be limited to basic support and voluntary symptomatic treatment, and that such treatment also include access to exercise and reading material. See Cloninger Aff. ¶¶ 18-19.

In addition, Sell also presented the court with a report from the Federal Bureau of Prisons Institutional Metropolitan Correctional Center ("MCC") in which Dr. Daniel Greenstein, the forensic psychologist at MCC, stated that delusional disorders do not typically respond to medication or psychotherapy.

Based on the totality of this evidence, Sell argues that the district court was clearly erroneous in finding that antipsychotic medication was medically appropriate. He contends that the district court erred by basing its finding, in part, on testimony that atypical antipsychotic medications have more benign side effects, because atypical drugs can only be administered orally, thus they cannot be given involuntarily. Sell also argues that the government did not prove that the medication has a reasonable probability of restoring competency. Finally, Sell argues that the court erred in finding medical appropriateness when the government failed to disclose

which medication it would use.[14] Sell posits that without knowing which drugs would be administered, he was incapable of making anything more than a generalized argument. See United States v. Sell, No. 4: 98CR177 at 7 (April 4, 2001) (upholding Magistrate's order allowing the involuntarily medication of Sell and stating that Sell's arguments against medication were generalized).

We disagree with these assertions. We acknowledge that there is a difference of opinion on the efficacy of using antipsychotic drugs to treat delusional disorder, but we do not believe that the district court committed clear error in finding that the government proved medical appropriateness by clear and convincing evidence. First, the government presented evidence that the medication can reasonably be expected to minimize Sell's delusions and render him competent for trial. Dr. DeMier has a 50% success rate and Dr. Wolfson has a 75 % success rate in restoring competency to patients with delusional disorders. Moreover, the medication improved the condition of all the patients they treated, whether or not they were restored to competency. Dr. Wolfson testified about how the medication works, stating that the medication should reduce the impact of the delusion on Sell's thought process. Although we cannot say with 100% certainty whether Sell will regain competency with his treatment, the district court did not clearly err in finding a sufficient likelihood that antipsychotic medication will restore Sell's competence.

Second, the government proved that the side-effects produced by the medication could be minimized through careful treatment and changing medications and dosages. Although Dr. Wolfson did not name a specific medication, he did name the two he would most likely use. Therefore, we reject Sell's contention that he was not given the opportunity to make specific objections to specific drugs. Furthermore,

---

[14]Dr. Wolfson stated that he did not want to be pinned down to a single drug because he hoped to leave part of the choice up to Sell. He recommended that the drugs Quetiapine or Olanzapine be used.

-16-

we reject Sell's argument that the court erred in basing its opinion in part on the availability of atypical antipsychotic drugs which can only be administered orally. The availability of the atypical medications was not determinative to the district court's findings, and the evidence supports the conclusion that the doctors treating Sell will be able to reduce the incidence of unpleasant and harmful side-effects produced by typical antipsychotic medication as well.

Finally, the district court appropriately considered Sell's medical interest. The court noted that Sell's delusions interfere with his ability to make sound judgments about his life and his treatment, and that his disorder currently impairs and misleads his interpretation of reality and his reasoning. The government presented evidence that antipsychotic medication is commonly used to help reduce delusions and their impact on an individual's life, and the court found that these benefits outweighed the risks associated with antipsychotic drugs.

The district court did not err in applying the wrong standard of review. As required, the court found that the government has an essential interest in adjudicating the serious charges against Sell. The court found that involuntary medication is the only way for the government to achieve its interest in fairly trying Sell and found that the medication is medically appropriate for him. The government proved these elements by clear and convincing evidence. Therefore, we find no reversible error in the standard of review employed by the district court.

We note, however, that this is a limited holding. We do not believe this standard will be met in all circumstances in which the government wishes to restore competence. Furthermore, we note that an entirely different case is presented when the government wishes to medicate a prisoner in order to render him competent for execution. See, e.g., Singleton v. Norris, 267 F.3d 859 (8th Cir. 2001), *vacated and reh'g en banc granted* (Dec. 5, 2001). Therefore, our holding must be read narrowly.

D.      Sell's Sixth Amendment Rights

Finally, we consider whether the district court properly considered Sell's Sixth Amendment right to a fair trial when it ordered the forcible medication. The district court held that Sell's Sixth Amendment claim was premature because the effects of the medication on his competency to assist counsel and on his demeanor could properly be considered after medication. We note that before forcibly medicating an accused, there must be evidence that he will be able to participate in a fair trial. See Brandon, 158 F.3d at 960. That burden was met in this case. First, the magistrate found that the evidence indicated that Sell would be able to participate meaningfully in his trial while he is under the influence of the medication. See United States v. Sell, 4:98CR177 at 13 (E.D. Mo. Aug. 9, 2000). Also, the magistrate found that the medication would allow him to communicate with his counsel in a rational manner. See id. The magistrate further noted that Dr. Wolfson intends to use drugs with a low side-effect profile, to change drugs and dosages based on the side-effects Sell experiences, and above all, to avoid sedation. See id. The district court affirmed these findings. See generally United States v. Sell, 4:98CR177 at 5-9 (E.D. Mo. Apr. 4, 2001)

We find that the medical evidence presented indicated a reasonable probability that Sell will fairly be able to participate in his trial. As a result, we believe that the effects of the medication on Sell's competency and demeanor may properly be considered once the medication is administered. The district court noted its willingness to re-examine Sell's Sixth Amendment claim after the medication regimen has begun. See id. at 15. The evidence offered, that the drugs should not interfere with Sell's right to a fair trial, as well as post-medication procedures that ensure he will not be tried unfairly, are sufficient to protect Sell. There is no reversible error.

### III. Conclusion

Having found no reversible errors, we affirm the district court's determination that Sell may be involuntarily medicated for the purpose of rendering him competent to stand trial.

BYE, Circuit Judge, dissenting.

Unlike the majority, I would apply the strict scrutiny standard of review for the reasons enunciated by the Sixth Circuit in <u>United States v. Brandon</u>, 158 F.3d 947, 956-61 (6th Cir. 1998). But even under the majority's three-part test, the charges against Dr. Sell are not sufficiently serious to forcibly inject him with antipsychotic drugs on the chance it will make him competent to stand trial. I therefore respectfully dissent.

The first part of the majority's test requires the government to demonstrate an essential interest that outweighs his interest in remaining free from medication. <u>Ante</u> at 11. The majority perfunctorily concludes the government's interest in prosecuting the defendant for sixty-two counts of fraud and one count of money laundering qualifies as an essential interest that trumps Dr. Sell's significant liberty interest in refusing antipsychotic medication. I strongly disagree.

While the government possesses an interest in bringing a defendant to trial, <u>ante</u> at 12, I do not believe every charge is sufficient to justify forcible medication of a defendant. <u>See</u> <u>Riggins v. Nevada</u>, 504 U.S. 127, 135 (1992) (stating the government *might* be able to medicate a defendant involuntarily if "it could not obtain an adjudication of [his] guilt or innocence by using less intrusive means") (emphasis added). It is helpful to compare two recent decisions confronting this precise issue. In <u>United States v. Weston</u>, 255 F.3d 873 (D.C. Cir. 2001), the Court of Appeals for

the District of Columbia recognized the government's interest in adjudicating those who violate the law. In that case, Russell Weston entered the Capitol building and shot three police officers, killing two of them. A grand jury indicted Weston on two counts of *murder*, and one count of *attempted murder* of a federal law officer, in addition to three counts of *using a firearm in a crime of violence*. Weston explained that "[t]he government's interest in finding, convicting, and punishing criminals reaches its zenith when the crime is the murder of federal police officers in a place crowded with bystanders where a branch of government conducts its business." 255 F.3d at 881. Weston also noted "[t]he statutory sentences for the crimes Weston is accused of committing—*life in prison and death*—reflect the intensity of the government's interest in bringing those suspected of such crimes to trial." Id. (emphasis added).

Weston typifies the case where the government's interest is paramount because the charges include the most serious crimes known to man. Few cases involve crimes as serious as those in Weston, however. In Brandon, the Sixth Circuit noted the government's reduced interest in trying a defendant accused of lesser crimes. 158 F.3d at 947. Ralph Brandon was charged with sending a threatening communication through the mail. The Sixth Circuit stated "[w]e find it difficult to imagine . . . that the government's interest in prosecuting the charge of sending a threatening letter through the mail could be considered a compelling justification to forcibly medicate Brandon." Id. at 961; cf. Bee v. Greaves, 744 F.2d 1387, 1395 (10th Cir. 1984) (questioning whether the state's interest in trying suspects could ever outweigh a criminal defendant's interest in avoiding forcible medication with antipsychotic drugs). Brandon also noted the maximum penalty the defendant faced for sending a threatening communication—five years imprisonment. 158 F.3d at 961.

Weston and Brandon teach us that the forcible administration of antipsychotic medication may be warranted when the government seeks to prosecute incontestably serious crimes, but not when it seeks to prosecute crimes less so. Cases involving

-20-

crimes of intermediate severity may present vexing questions, but Dr. Sell's case poses no such challenge. The crimes with which he has been charged are comparable to those in <u>Brandon</u> and thoroughly distinct from those in <u>Weston</u>. Dr. Sell is charged with making false representations in connection with the payment of health care services, 18 U.S.C. § 1035(a)(2), and money laundering, 18 U.S.C. § 1957(a). The maximum penalty for these charges is five and ten years imprisonment, respectively. He cannot be put to death nor imprisoned for life if convicted of these crimes, as was the case in <u>Weston</u>. He is charged with crimes which are far less serious than the violent, heinous and deadly crimes with which Weston was charged. Indeed, they are nonviolent and purely economic. There is no identifiable victim for these types of crimes; rather, only society's interest is harmed.

The majority deems the charges serious in part because of the number of counts Dr. Sell faces (63). At first blush, the sixty-two counts of fraud and the single count of money laundering might appear to make the charges seem more serious, but the sheer number is an inaccurate yardstick for measuring the severity of his alleged offenses. He will be sentenced under the United States Sentencing Guidelines, which direct his sentence to be determined by the total dollar value of the fraud, *not* the number of counts. <u>See</u> U.S. Sentencing Guidelines Manual (U.S.S.G.) ch. 3 pt. D & §§ 5G1.2, 2B1.1, 2S1.1 (2001). An overly generous estimation of Dr. Sell's alleged illegal activity would place the value of his fraud within the range of $400,000 to $1,000,000. Applying this estimate, his base offense level would be 20 and (assuming he has no prior criminal history) his sentencing range would be 33-41 months. <u>See</u> U.S.S.G. § 2B1.1. This sentencing range demonstrates the charges against him are not serious enough to justify forcible medication. <u>Ante</u> at 12 ("Not all charges, however, are sufficient to justify forcible medication of a defendant; rather, the charges must be serious). In any event—setting aside the Guideline estimations altogether—Dr. Sell's potential sentence is far more proportional to the maximum five year sentence in <u>Brandon</u> than to the maximum life-in-prison and death sentences in <u>Weston</u>.

The majority states Dr. Sell does not deny the severity of the fraud and money laundering charges. Ante at 12. This representation is wrenched from its context, however. While he does not deny the severity of these charges in the abstract, he certainly does not concede they are serious enough to warrant forced medication. In fact, Dr. Sell devotes most of his efforts to defending and minimizing the charges of conspiring to murder an FBI agent and witness, not to discussing the fraud and money laundering charges.

More telling still, neither the government nor the district court believe the fraud and money laundering charges *alone* support the forcible administration of medication. The government all but dismisses these counts when arguing about the severity of the charges against him. The government focuses its attention almost entirely on the charges related to the conspiracy to murder the FBI agent and witness. Neither in its brief, nor during oral argument, has the government claimed the fraud and money laundering charges by themselves are serious enough to warrant forced medication. Likewise, the district court acknowledged the conspiracy to commit murder charges tipped the balance in its conclusion that Dr. Sell's alleged offenses were serious enough to warrant the forcible administration of antipsychotic drugs.

Although the majority properly omits the charges of conspiracy to commit murder from its analysis, ante at 12 n.8, the majority inexplicably turns a blind eye to the apparent agreement of all parties that the fraud and money laundering charges alone are insufficiently serious to warrant forcible medication. This course of action is questioned.

This is not meant to suggest the crimes with which Dr. Sell has been charged should not be prosecuted. They will and should be. However, this defendant should not be forced to take antipsychotic drugs in order to be prosecuted for them. The government's interest in forcibly medicating an accused murderer may be essential, but its interest in forcibly medicating an accused thief is not. In my view, these

charges are not serious enough to warrant the forced medication of the defendant, who, we must not forget, is a non-dangerous pre-trial detainee cloaked with the presumption of innocence. As a result, the government has failed to satisfy the first part of the majority's three-part test.

\* \* \*

The government is not without recourse upon a finding that the charges against Dr. Sell are insufficiently serious to warrant forcible medication. He will not be set free. A civil commitment is in order for him until he becomes competent, or voluntarily agrees to take medication. See Riggins, 504 U.S. at 145 (Kennedy, J., concurring) (stating that if the State cannot render the defendant competent without involuntary medication, then it must resort to civil commitment). The government asserts that its interest in punishing crime will be diminished by the option of civil commitment. It is true Dr. Sell's criminality will not be adjudicated as the civil commitment unfurls. However, the government's interest in forcing him to stand trial on charges that may result in such limited punishment does not outweigh his substantial rights under the First, Fifth and Sixth Amendments. See Brandon, 158 F.3d at 956-61 (enumerating an individual's rights in refusing antipsychotic medication).

I respectfully dissent.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.