# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1492

_____

Charles Laverne Singleton,                *
                                        *

          Appellant,              *

                                      *   Appeal from the United States
      v.                      *   District Court for the
                                        *   Eastern District of Arkansas.

Larry Norris, Director, Arkansas   *
Department of Correction,        *

                                        *

          Appellee.              *

_____

Submitted:  January 16, 2002

Filed:  February 10, 2003

_____

Before WOLLMAN,[1] Chief Judge, HEANEY, BRIGHT, McMILLIAN, BOWMAN,
     LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, MURPHY, BYE, and
     RILEY, Circuit Judges, En Banc.

_____

WOLLMAN, Chief Judge.

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United
States Court of Appeals for the Eighth Circuit at the close of business on January 31,
2002.  He has been succeeded by the Honorable David R. Hansen.

Charles Laverne Singleton appeals the district court's[2] order denying his petition for writ of habeas corpus. The district court rejected Singleton's contention that the administration of mandatory antipsychotic medication to a prisoner, initially constitutional under Washington v. Harper, 494 U.S. 210 (1990), becomes unconstitutional once an execution date is set because at that time it ceases to be in the prisoner's medical interest. After a divided panel of this court reversed, Singleton v. Norris, 267 F.3d 859 (8th Cir. 2001), we granted the State's petition for rehearing en banc and vacated the panel opinion. We now affirm the district court's order.

## I.

In 1979, the State of Arkansas convicted Singleton of capital felony murder and aggravated robbery. He received a sentence of death for the murder and a sentence of life imprisonment for the robbery. The facts giving rise to Singleton's conviction were set forth in the Arkansas Supreme Court's opinion on direct appeal:

> The victim, Mary Lou York, was murdered in York's Grocery Store at Hamburg on June 1, 1979. She died from loss of blood as a result of two stab wounds in her neck.
>
> The evidence of guilt in this case is overwhelming. Patti Franklin saw her relative Singleton enter York's Grocery at approximately 7:30 p.m. on the day of the crime. Shortly after he entered Patti heard Mrs. York scream, "Patti go get help, Charles Singleton is killing me." Patti then ran for help. Another witness, Lenora Howard, observed Singleton exit the store and shortly thereafter witnessed Mrs. York, who was "crying and had blood on her," come to the front door. Police Officer Strother was the first to arrive at the scene and found Mrs. York lying in a pool of blood in the rear of the store. The officer testified Mrs. York told him that Charles Singleton "came in the store, said this is a robbery, grabbed her around the neck, and went to stabbing her." She

---

[2]The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

then told Officer Strother that "there's no way I can be all right, you know I'm not going to make it. I've lost too much blood." Mrs. York was taken to the hospital in an ambulance and was attended by her personal physician, Dr. J. D. Rankin. While en route to the hospital, she told Dr. Rankin several times that she was dying and that Singleton did it. Mrs. York died before reaching the emergency room of the hospital.

Singleton v. State, 623 S.W.2d 180, 181 (Ark. 1981). Singleton's conviction and sentence for capital felony murder were affirmed, but his conviction for the underlying felony of aggravated robbery was set aside. Id.

After Singleton was denied post-conviction relief in state court, his execution was scheduled for June 4, 1982. Singleton then petitioned the district court for a stay of execution and writ of habeas corpus, raising claims including ineffective assistance of counsel, use of invalid aggravating factors, and that he was incompetent and thus ineligible for execution under Ford v. Wainwright, 477 U.S. 399 (1986). Singleton v. Lockhart, 653 F. Supp. 1114, 1116 (E.D. Ark. 1986). The district court sustained the conviction but reversed the sentence of death, holding that the pecuniary gain aggravating factor was invalid since it duplicated a factor in the underlying robbery-murder charge. Id. at 1135-36. On appeal, a panel of this court affirmed the order upholding the conviction, but reversed the order vacating the death sentence. Singleton v. Lockhart, 871 F.2d 1395, 1396 (8th Cir. 1989). Because the district court did not reach the Ford claim, it was not at issue on appeal. On remand for reinstatement of the death sentence, Singleton claimed ineffective assistance of counsel at the penalty phase and challenged the constitutionality of the Arkansas death penalty statute. The district court denied the petition and we affirmed. Singleton v. Lockhart, 962 F.2d 1315, 1316 (8th Cir. 1992).

In December 1992, Singleton filed an action in state court claiming that he was incompetent and could not be executed. He requested that his treatment with antipsychotic drugs be terminated and that a competency examination be held after

-3-

the effect of the drugs had subsided. In addition, he asked for a declaratory judgment that he was not competent to be executed. The trial court denied his motion, and the Arkansas Supreme Court affirmed. Singleton v. Endell, 870 S.W.2d 742 (Ark. 1994). In his second federal habeas petition, filed in 1993 but held in abeyance until the state proceedings concluded, Singleton raised the Ford claim, along with claims of double counting and actual innocence. The district court held two hearings and dismissed his petition. On appeal, Singleton conceded that he was competent because of the antipsychotic medication he was taking voluntarily. We affirmed the dismissal of his petition, noting that a future Ford claim based upon changed circumstances was not foreclosed by the decision. Singleton v. Norris, 108 F.3d 872, 874 (8th Cir. 1997).

In 1997, the State placed Singleton on an involuntary medication regime after a medication review panel unanimously agreed that he posed a danger to himself and others. After the medication took effect, Singleton's psychotic symptoms abated. In January 2000, the State scheduled his execution for March 1, 2000. In February 2000, Singleton filed a petition for habeas corpus pursuant to 28 U.S.C. § 2241, arguing that the State could not constitutionally restore his Ford competency through use of forced medication and then execute him. The district court denied the petition, finding "no evidence in this record that the actions and decisions of the medical personnel involved were in any degree motivated by the desire, purpose or intent to make Mr. Singleton competent so that he could be executed." Singleton appealed, and we granted a stay of execution.

We ordered a limited remand in March 2000 to answer two remaining questions of fact. First, whether Singleton was Ford-competent prior to the implementation of the Harper mandatory medication order in 1997. Second, whether Singleton would regress into psychosis and become Ford-incompetent if he stopped taking the medication. In answer to the first question, the district court found that Singleton was not Ford-competent at the time the involuntary medication regime began in 1997. The answer to the second question was less clear. The district court

-4-

found that Singleton would regress into psychosis without medication, but could not say with certainty when psychotic symptoms would resume and whether he would become Ford-incompetent. Although the district court did not make a specific finding as to Singleton's present competence, Singleton does not argue that under medication he is unaware of his punishment and why he is to be punished.

## II.

The posture of this case has changed during the course of this appeal. Singleton was placed under a Harper involuntary medication order in 1997. That order was subject to annual review and was not renewed by Singleton's doctors in January 2000 while this appeal was pending. Since that time Singleton has taken his medication voluntarily. A case is not moot if there is a "reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." Murphy v. Hunt, 455 U.S. 478, 482 (1982) (per curiam) (citation omitted). In Washington v. Harper, the Court held that a live controversy remained even though Harper's involuntary medication order had lapsed. 494 U.S. at 218-19. Although Singleton now takes his medication voluntarily, should he refuse to take his medication, the State would be obligated to medicate him to control his psychotic symptoms, thereby reviving his claim. Because the combination of a Harper order and a scheduled date of execution will likely recur in the future, we reach the merits of Singleton's claims under this exception to the mootness doctrine.

## A.

The State urges us to affirm the district court on the ground that 28 U.S.C. § 2244 bars Singleton's assertion of a Ford or Ford-derivative claim. Conceding that his claim would be barred if brought under § 2254, Singleton argues that his claim is properly before the court under authority of § 2241. We recently considered the application of § 2244's restrictions on successive habeas applications to a state

prisoner's application brought under § 2241.  Crouch v. Norris, 251 F.3d 720 (8th Cir. 2001).  Crouch applied to this court for permission to file a second habeas petition, claiming that the state had violated his due process rights by refusing to grant him parole.  Id. at 722.  Crouch argued that because he was not challenging the validity of his conviction or sentence but only the manner in which it was carried out, his claim was properly brought under § 2241 and was not subject to the restrictions in § 2244.  Id. at 722-23.  We considered several cases which held that a federal prisoner may challenge the manner of execution of his sentence by bringing his petition under § 2241 rather than § 2255.  Id. at 722-23.  Section 2255, governing federal prisoners, contains narrower language than that in § 2254, which governs state prisoners.  The focus of § 2254 is on the petitioner's custody, not, as in § 2255, on flaws in the underlying judgment or sentence.  Id. at 723.  Thus, § 2254 is the only means by which "a person in custody pursuant to the judgment of a State court" may raise challenges to the validity of his conviction or sentence or to the execution of his sentence.  Id.

That Singleton's present petition is subject to § 2244 limitations on "second or successive" petitions does not end our inquiry.  Section 2244 requires dismissal of a second or successive petition unless the claim raised asserts a new rule of constitutional law or raises new facts that establish the petitioner's innocence of the underlying offense.  As Singleton concedes, he satisfies neither exception.

The threshold determination in a § 2244 inquiry is whether or not the petition is a "second or successive" application.  As we discussed at some length in Crouch, whether a later petition is considered "successive" is guided by abuse of the writ principles.  251 F.3d at 723-24 (collecting cases).  A claim raised in a prior petition that was dismissed as unripe is not barred by § 2244(b).  Stewart v. Martinez-Villareal, 523 U.S. 637, 643-45 (1998).  Similarly, a habeas petition raising a claim that had not arisen at the time of a previous petition is not barred by § 2244(b) or as an abuse of the writ.  In re Cain, 137 F.3d 234, 236-37 (5th Cir. 1998).  We conclude

-6-

that Singleton's petition is not "second or successive" because his claim did not arise until he was subject to both a Harper involuntary medication order and a scheduled date of execution. In 1995 Singleton was not under an involuntary medication order. Thus the claim he presents in this appeal could not have been raised prior to the issuance of the 1997 Harper order and is not barred.

**B.**

We turn now to consider the interrelated issues of whether the State may forcibly administer antipsychotic medication to a prisoner whose date of execution has been set and whether the State may execute a prisoner who has been involuntarily medicated under a Harper procedure. Singleton argues that the involuntary medication regime, legal under Harper during a stay of execution, becomes illegal once an execution date is set because it is no longer in his best medical interest. This issue is one of first impression for this court and is a question of law we review de novo. Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002) (standard of review).

We are guided in our inquiry by Ford v. Wainwright and Washington v. Harper. In Ford, the Supreme Court addressed for the first time the limits imposed by the Eighth Amendment on a State's power to execute an insane prisoner. Reviewing the common law at the time the Bill of Rights was enacted, the Court found a clear rule against executing the insane despite divergent rationales for such a rule, including the inhumanity and the lack of deterrent and retributive value of such an act. Ford, 477 U.S. at 407-08. In a concurring opinion, Justice Powell set out the governing standard for determining whether a prisoner is competent to be executed: "[T]he Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." Id. at 422 (Powell, J., concurring).

In <u>Harper</u>, the Court addressed the question of what limit the Fourteenth Amendment Due Process Clause places on the power of a State to treat a mentally ill prisoner with antipsychotic drugs against his will. Harper, a state prisoner and diagnosed schizophrenic, refused to continue taking antipsychotic medication. 494 U.S. at 214. After receiving medication against his will, Harper challenged as insufficient the procedural protections prisoners were afforded before being forcibly medicated. <u>Id.</u> at 217-18. Noting that "procedural protections must be examined in terms of the substantive rights at stake," the Court analyzed the underlying substantive issue of what factual predicate is required before a State may forcibly administer antipsychotic drugs to a prisoner. <u>Id.</u> at 220. The Court held that a State may forcibly administer antipsychotic drugs to "a prison inmate who has a serious mental illness . . . if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." <u>Id.</u> at 227.

The limit of a State's authority to medicate a prisoner involuntarily has been developed further in the context of maintaining or restoring a defendant's competence to stand trial. In <u>Riggins v. Nevada</u>, the Court decided whether a defendant who was forcibly medicated with antipsychotic drugs to ensure his competence had been denied his right to a fair trial. 504 U.S. 127 (1992). Citing <u>Harper</u>, the Court found that the "substantial interference with [the prisoner's] liberty" was particularly severe due to the side effects often associated with those drugs. <u>Id.</u> at 134. Declining to adopt a standard of strict scrutiny, the Court stated that due process required a showing of medical appropriateness and, considering less intrusive alternatives, a showing that treatment is "essential for the sake of [the defendant's] own safety or the safety of others." <u>Id.</u> at 135. Riggins was medicated without "*any* determination of the need for [the medication] or *any* findings about reasonable alternatives." <u>Id.</u> at 136. The Court held that this was inadequate, considering the "substantial probability of trial prejudice" in the form of the drug's effect on Riggins's appearance, testimony, and communication with counsel. <u>Id.</u> at 138.

We recently considered a due process challenge to forced administration of medication where the state's sole purpose was to restore a defendant's competency for trial. United States v. Sell, 282 F.3d 560 (8th Cir.), cert. granted, 123 S. Ct. 512 (2002). In Sell, we held that the government had an "essential interest" in bringing Sell to trial that outweighed his liberty interest in refusing medication. Id. at 568. To justify forcibly medicating an individual to restore competency for trial, the government must (1) "present an essential state interest that outweighs the individual's interest in remaining free from medication," (2) "prove that there is no less intrusive way of fulfilling its essential interest," and (3) "prove by clear and convincing evidence that the medication is medically appropriate." Id. at 567 (citing Riggins, 504 U.S. at 135). "Medication is medically appropriate if: (1) it is likely to render the patient competent; (2) the likelihood and gravity of side effects do not overwhelm its benefits; and, (3) it is in the best medical interests of the patient." Id. (citing United States v. Weston, 255 F.3d 873 (D.C. Cir. 2001), and Harper, 494 U.S. at 227). Where the charges against the defendant are serious, the government's essential interest in bringing a defendant to trial outweighs his significant liberty interest in avoiding unwanted medication. Id. at 568.

We acknowledge, of course, Sell's reservation of the question presented by Singleton's appeal ("[A]n entirely different case is presented when the government wishes to medicate a prisoner in order to render him competent for execution.") and its admonishment that "our holding must be read narrowly." Id. at 571 (citations omitted). Notwithstanding Sell's cautionary comments, we believe that the standards set forth above are applicable to the district court's rulings in Singleton's case.

That the government has an essential interest in carrying out a lawfully imposed sentence cannot be doubted. Moran v. Burbine, 475 U.S. 412, 426 (1986) (recognizing "society's compelling interest in finding, convicting, and punishing those who violate the law"). We need not decide under what circumstances carrying out a particular sentence is not "essential." Society's interest in punishing offenders

-9-

is at its greatest in the narrow class of capital murder cases in which aggravating factors justify imposition of the death penalty. This societal interest must be weighed against Singleton's interest in being free of unwanted antipsychotic medication. The record before us indicates that Singleton prefers to take the medication rather than be in an unmedicated and psychotic state.[3] In addition, Singleton has suffered no substantial side effects. On these facts, the State's interest in carrying out its lawfully imposed sentence is the superior one.

Singleton has suggested no less intrusive means of ensuring his competence short of antipsychotic medication. The Eighth Amendment forbids the execution of an incompetent person, Ford, 477 U.S. at 401, thus the State may achieve its essential interest in carrying out Singleton's sentence of execution only if Singleton is competent. In our order of limited remand, we did not ask the district court to make

---

[3]During the hearing conducted pursuant to our order of limited remand, Singleton stated several times that he desires to take the antipsychotic medication. The transcript further indicates Singleton's attempts to avoid the penalty Arkansas has imposed on him. Dr. Kenneth D. Wright's notes of his interview with Singleton on March 27, 2000, read in part:

> I advised Mr. Singleton that he was taking the medication in shot form that was a tranquilizer and frequently had a side effect of being sedating. I advised him to consider changing the medication to pill form. Mr. Singleton indicated that he could not do this. His exact words were as follows, "I don't want it to seem like I'm running a game, but I have a case going involving forced medication."
>
> At this point, I interrupted Mr. Singleton and advised him that several months ago I had elected not to return him to the Forced Medication Review Panel because he appeared to be in remission from psychotic symptoms and he had been taking his medication voluntarily. Mr Singleton, at this point, became enraged, indicating that I did not have the authority to change his medication from being forced.
> . . . .
> Mr. Singleton stormed out of the interview. . . .

Apr. 18, 2000, Hr'g Joint Ex. 2.

a finding as to Singleton's present competence. Other than his "artificial competence" theory, Singleton has never argued, and in fact has agreed repeatedly, that he is competent while he is medicated. In its report, the district court concluded that without medication Singleton would revert to a delusional psychotic state, but it is uncertain whether he would also become Ford-incompetent. On this record, treatment with antipsychotic drugs is necessary to alleviate Singleton's psychosis, and there is no less intrusive medical treatment by which the government can ensure Singleton's competence.

Finally, we reach the core of the dispute: whether the antipsychotic medication is medically appropriate for Singleton's treatment. We review the district court's findings of fact under the clearly erroneous standard. Sell, 282 F.3d at 568. The first two determinations in the Sell analysis of medical appropriateness are not in serious dispute: first, whether the medication is likely to restore competence, and second whether the expected side effects overwhelm the benefits. The district court found that Singleton was Ford-incompetent at the time the mandatory medication was started in 1997. Singleton's symptoms have been kept almost completely under control since the initiation of the mandatory medication regime in 1997, and he has repeatedly conceded his competence while medicated. In its denial of Singleton's petition for habeas corpus, the district court found the record devoid of any significant negative side effects from the antipsychotic medication. These findings are not clearly erroneous, and they establish both that the medication is effective and that the expected side effects do not overwhelm the benefits of the medicine.

Central to Singleton's argument is his contention that medication "obviously is not in the prisoner's ultimate best medical interest" where one effect of the medication is rendering the patient competent for execution. Singleton does not dispute that the antipsychotic medication is in his medical interest during the pendency of a stay of execution. He has stated he takes it voluntarily because he does not like the symptoms he experiences without it. He also does not dispute the lack

of serious side effects. The factor that Singleton contends takes him outside the scope of <u>Harper</u> is not the existence of serious harmful side effects or an insufficient medical need, but the very psychosis-reducing effect of the medicine. By focusing on his "ultimate best medical interest," Singleton presents the court with a choice between involuntary medication followed by execution and no medication followed by psychosis and imprisonment. Faced with these two unpleasant alternatives, he offers a third solution: a stay of execution until involuntary medication is no longer needed to maintain his competence.

By focusing on his long-term medical interest, Singleton implicitly concedes that the medication is in his short-term medical interest. Several doctors, both during the <u>Harper</u> determination and at other times, have found the medication to be effective in controlling Singleton's psychotic symptoms. Singleton's argument regarding his long-term medical interest boils down to an assertion that execution is not in his medical interest. Eligibility for execution is the only unwanted consequence of the medication. The due process interests in life and liberty that Singleton asserts have been foreclosed by the lawfully imposed sentence of execution and the <u>Harper</u> procedure. In the circumstances presented in this case, the best medical interests of the prisoner must be determined without regard to whether there is a pending date of execution. Thus we hold that the mandatory medication regime, valid under the pendency of a stay of execution, does not become unconstitutional under <u>Harper</u> when an execution date is set.

Closely related to his due process argument, Singleton also claims that the Eighth Amendment forbids the execution of a prisoner who is "artificially competent." Singleton relies principally on a case construing an analogous provision in the Louisiana Constitution. <u>State v. Perry</u>, 610 So. 2d 746 (La. 1992). The <u>Perry</u> court, noting that the Louisiana provision is an expansion on the protections of the Eighth Amendment, concluded that the execution of an insane inmate who had been forcibly medicated into competence would violate the state constitution. <u>Id.</u> at 765-

-12-

66. State courts of last resort may interpret their state constitutions as they see fit. We note, however, that the <u>Perry</u> court accepted the view of "best medical interests" that we have rejected, <u>Id.</u> at 766. The court also found Perry's medication was ordered solely for purposes of punishment and not for legitimate reasons of prison security or medical need. <u>Id.</u> at 757. We decline to undertake a difficult and unnecessary inquiry into the State's motives in circumstance where it has a duty to provide medical care. <u>DeShaney v. Winnebago County Dep't of Soc. Servs.</u>, 489 U.S. 189, 199-200 (1989); <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976) ("These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration."). The findings below support a conclusion that the state was under an obligation to administer antipsychotic medication, thus any additional motive or effect is irrelevant. <u>Ford</u> prohibits only the execution of a prisoner who is unaware of the punishment he is about to receive and why he is to receive it. A State does not violate the Eighth Amendment as interpreted by <u>Ford</u> when it executes a prisoner who became incompetent during his long stay on death row but who subsequently regained competency through appropriate medical care.

We affirm the order of the district court denying Singleton's petition for writ of habeas corpus and vacate the stay of execution.

LOKEN, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment.

I concur in the court's judgment because I join Part II.B. of its opinion, which holds that a State does not violate the Eighth or Fourteenth Amendments by executing an inmate who has "regained competency through appropriate medical care." <u>Ante</u> at 13. But I disagree with Part II.A. of the opinion, which concludes that our jurisdiction to consider this issue is not barred by 28 U.S.C. § 2244(b) because the

claim "had not arisen at the time of [Singleton's] previous [habeas] petition." Ante at 6. Thus, I dissent in part.

Section 2244(b) became effective on April 24, 1996, sharply limiting the right of a state inmate to file a "second or successive" federal habeas petition. Section 2244(b)(1) provides that claims presented in a prior petition "shall be dismissed." Claims not previously presented "shall be dismissed" unless they fall within one of two narrow exceptions set forth in § 2244(b)(2).[4] And subsections 2244(b)(3)(A) and (C) provide that a second or successive petition may not be filed in the district court unless the court of appeals has authorized the filing after determining that the petitioner made a prima facie showing that satisfies these requirements. In this case, Charles Singleton's prior federal habeas petition was dismissed on the merits. See Singleton v. Norris, 108 F.3d 872 (8th Cir. 1997). As we did not authorize the filing of a new petition under § 2244(b), it is barred. Yet the court now evades the statute by concluding that Singleton's new petition is not "second or successive" within the meaning of § 2244(b).

1. Before discussing the court's failure to properly define the term "second or successive," I note that the court does not properly apply its own restrictive definition. The claim here at issue -- whether it is constitutional to execute an inmate who is competent only by reason of involuntary medical treatment -- was not only ripe, it *was raised* in Singleton's prior federal habeas proceeding. Singleton raised a Ford v. Wainwright claim in his prior petition, and the district court held a competency hearing on that claim in May 1995:

---

[4]To satisfy § 2244(b)(2), petitioner must show that the claim relies on a new rule of constitutional law made retroactive by the Supreme Court, *or* that the factual predicate for the claim could not have been discovered previously and the facts underlying the claim, if proven, "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

> The district court found that Singleton, who was voluntarily taking
> antipsychotic medication, was competent. . . .  Although he raises the
> possibility that he may in the future have a claim of incompetency,
> Singleton concedes that he currently has no support for such a claim in
> view of his voluntary ingestion of antipsychotic medication.

Singleton, 108 F.3d at 873.  Whereas a Ford competency claim is fact-intensive, whether it is constitutional to execute an inmate who is competent only by reason of medical treatment -- *whether voluntarily or involuntarily administered* -- is an issue of law that was apparent to Singleton's attorneys no later than the May 1995 competency hearing.  This is confirmed by Singleton's Opening Brief on this appeal, which stated (at page 16):

> In 1993, when an execution date was set, [Singleton] filed a petition
> alleging, *inter alia*, that he was incompetent to be executed and that if
> he appeared to be competent, it was as a result of involuntary
> medication.  At a hearing before Judge Eisele in 1995, however,
> Singleton testified that he was voluntarily taking antipsychotic
> medication.

Thus, Singleton presented and abandoned a ripe involuntary medication claim in a prior habeas petition that was dismissed on the merits.  Even by the court's own standard, his new petition is "second or successive," and § 2244(b)(1) requires that the claim "shall be dismissed."

2.  The court construes the term "second or successive" in § 2244(b) as not applying if the second petition raises a claim "that had not arisen" at the time of the prior petition.  The court relies on two cases, In re Cain, 137 F.3d 234 (5th Cir. 1998), which involved an inmate's loss of good time credits, and Crouch v. Norris, 251 F.3d 720 (8th Cir. 2001), which challenged the denial of parole.  Though Singleton

-15-

unquestionably presents the issue in the context of a <u>Ford</u>-driven claim,[5] the court inexplicably ignores prior decisions in which three of our sister circuits have expressly considered whether a <u>Ford</u> claim is second or successive within the meaning of § 2244(b).

The Fifth Circuit and the Eleventh Circuit have concluded that a <u>Ford</u> claim brought in a second habeas petition is subject to § 2244(b)'s limitations, even if the claim had not arisen when the first petition was denied on the merits. <u>In re Davis</u>, 121 F.3d 952, 954-56 (5th Cir. 1997); <u>In re Medina</u>, 109 F.3d 1556, 1563-66 (11th Cir. 1997), <u>cert. denied</u>, 520 U.S. 1151 (1997). But in <u>Martinez-Villareal v. Stewart</u>, 118 F.3d 628, 629 (9th Cir. 1997), the Ninth Circuit disagreed, holding "that § 2244's prohibition on second or successive petitions does not apply to a petition that raises only a competency to be executed claim under <u>Ford</u>."

The Supreme Court granted certiorari in <u>Martinez-Villareal</u>. The Court affirmed the Ninth Circuit, but on a much narrower ground, holding that when a claim is dismissed without prejudice as premature in an initial habeas petition, the petitioner may assert that claim in a later petition without satisfying one of the exceptions in § 2244(b)(2). "To hold otherwise would mean that a dismissal of a first habeas petition for technical procedural reasons would bar the prisoner from ever obtaining federal habeas review." <u>Stewart v. Martinez-Villareal</u>, 523 U.S. 637, 645 (1998). The Court expressly left unresolved whether "a <u>Ford</u> claim [raised] for the first time in a petition filed after the federal courts have already rejected the prisoner's initial habeas application . . . . would be a 'second or successive habeas corpus application'" within the meaning of § 2244(b). <u>Id.</u> at 645 n.*. Thus, the circuit split on the broader issue remains. This is our first opportunity to address it.

_____

[5]I will refer to Singleton's claim as "<u>Ford</u>-driven" because the argument that it is unconstitutional to execute an involuntarily medicated inmate is obviously premised upon the constitutional ruling in <u>Ford</u>.

The Supreme Court again dealt with the meaning of "second or successive" in Slack v. McDaniel, 529 U.S. 473, 487 (2000). Slack posed the question whether a petitioner whose first petition was dismissed without prejudice for failure to exhaust state court remedies under Rose v. Lundy, 455 U.S. 509 (1982), may return to federal court after exhausting all claims without having to satisfy the limitations in § 2244(b). Adhering to its analysis in Martinez-Villareal, the Court held that "[a] petition filed after a mixed petition has been dismissed under Rose v. Lundy before the district court adjudicated any claims . . . is not a second or successive petition."

Because Singleton's prior habeas petition was dismissed on the merits, this case is not governed by the narrow holdings in Martinez-Villareal and Slack, where the Supreme Court declined to apply § 2244(b) to claims previously dismissed without prejudice as premature, or to petitions previously dismissed without prejudice as unexhausted. In Crouch v. Norris and in this case, our court adopts the far broader rule that § 2244(b) does not apply to any claim that could not have been raised in the state inmate's prior petition. This rule is a partial judicial repeal of § 2244(b)(2)'s limitations on new claims in second or successive petitions. While I recognize that dicta in the Martinez-Villareal and Slack opinions can be read as supporting this construction of the statute, I doubt whether the Supreme Court will be willing to construe § 2244(b) in so hostile a fashion, and I strongly believe it is not our proper function to do so. As I said in my dissent in Crouch, 251 F.3d at 726-27:

> [Martinez-Villareal and Slack] involved claims raised but not decided on the merits in the first habeas applications. In those situations, it was reasonable as a matter of statutory construction for the [Supreme] Court to look at prior law in determining whether the *return* to federal court when the claims ripened should be considered "second or successive" for purposes of the new statute. Here, on the other hand, there can be no question Crouch is seeking to file a "second or successive" petition raising entirely new claims, and therefore no reasonable basis in statutory construction to ignore the plain meaning of § 2244(b)(2). . . .

-17-

It is not our prerogative as circuit judges to rewrite § 2244(b) because we would have legislated differently.

3.  Given our decision in this case, Singleton's Ford-driven claim is not likely to recur.  But Ford competency claims are fact intensive, so the issue left open by the Supreme Court in Martinez-Villareal -- whether a new Ford claim asserted on the eve of a petitioner's execution is "second or successive" when a prior federal habeas petition has been denied on the merits -- is likely to recur.  In my view, this is a difficult question for a circuit court to decide without further guidance from the Supreme Court.  On the one hand, I do not believe the Court will simply ignore the plain meaning of second or successive in § 2244(b), as our court does in this case.  On the other hand, the ruling in Ford was expressly based upon the state inmate's competency at the time of execution.  This timing factor led the Ninth Circuit in Martinez-Villareal to fear that the narrow gateways in § 2244(b) will "foreclose any federal review of a death row inmate's competency to be executed."  118 F.3d at 631.

Because Singleton raised and abandoned a ripe Ford-driven claim in his prior habeas proceeding, I need not resolve this difficult question.  I note, however, there are far narrower alternatives than the broad rule our court now adopts, a rule which will frustrate the congressional intent to restrict second and successive habeas petitions in non-capital cases such as Cain and Crouch.  First, the Supreme Court could adhere to Martinez-Villareal and limit the avoidance of § 2244(b) to petitioners whose Ford claims were dismissed as premature in an initial habeas petition.  That would encourage petitioners with foreseeable competency issues to raise them early, while relegating all other Ford claimants to the Court's original habeas jurisdiction.  See Felker v. Turpin, 518 U.S. 651, 658-62 (1996).  Second, because the Court recognized in Ford that no State permits the execution of an incompetent, 477 U.S. at 408, the Court could expand the Martinez-Villareal exception to § 2244(b) to include petitioners who assert new Ford claims that the state courts considered timely and resolved on the merits.  That may be hard to square with the plain meaning of

-18-

"second or successive," but it is consistent with the exhaustion principles discussed in <u>Martinez-Villareal</u>, 523 U.S. at 644-45. Third, the Court could expand the concept of "innocence of the death penalty," <u>see</u> <u>Sawyer v. Whitley</u>, 505 U.S. 333, 348 (1992), to include <u>Ford</u> claims, thereby bringing such claims within the class of second or successive petitions permitted under § 2244(b)(2)(B). (No circuit court could construe the statute this way given the Supreme Court's introductory statement in <u>Martinez-Villareal</u> that a <u>Ford</u> claim "does not fit within either of subsection (b)(2)'s exceptions." 523 U.S. at 642.)

HEANEY, Circuit Judge, dissenting, in which BRIGHT, McMILLIAN, and BYE, Circuit Judges, join.

Charles Singleton suffers from mental illness that makes him psychotic. At times he has been forced to take powerful psychotropic drugs; at other times he takes the medication voluntarily. The drugs often mask his underlying psychosis. The majority believes this makes him fit for execution. I believe that to execute a man who is severely deranged without treatment, and arguably incompetent when treated, is the pinnacle of what Justice Marshall called "the barbarity of exacting mindless vengeance." <u>Ford v. Wainwright</u>, 477 U.S. 399, 410 (1986). My reasoning is guided by the decisions of the Supreme Court, and supported by the rulings of state courts which have considered the issue, the overwhelming majority of scholarly commentary, and the ethical standards of the medical profession. I dissent.

**I.**

Charles Singleton has been on death row since 1979 as a result of his conviction for the capital felony murder of Mary Lou York. He has been on psychotropic medication during much of his stay in prison. This medication was prescribed initially to alleviate anxiety and depression. Beginning in 1987, however, Singleton's mental health began to deteriorate. He started to believe that his cell was

possessed by demons and had "demon blood" in it. He reported that his brother would come to his locked prison cell and take him out of it for walks. He was under the impression that a prison doctor had planted some type of device in his right ear and that his thoughts were being stolen from him when he read the Bible. During this time, he sustained a considerable loss of weight.

Singleton was diagnosed as likely schizophrenic and placed on antipsychotic medication. He initially took it on his own, but when he refused, he was forcibly medicated. For the next several years, Singleton continued to be treated for his psychosis. His medication was administered voluntarily at times, and at times it was administered forcibly. Whenever he was off his medication, his symptoms would resurface, and he would again experience hallucinations. In 1991, Singleton's treating doctor took him off his medication in order to determine when symptoms of his illness would reappear. Within a few months, he was observed stripping off his clothes and speaking in a strange language. He became paranoid and delusional, and believed that he had already been executed.

Singleton was again put on an involuntary medication plan. From November of 1991 until March of 1995, he remained on this treatment plan. Despite being treated at the time, symptoms of Singleton's mental illness flared up again in the summer of 1993. During this period, Singleton was under the impression that he was the victim of a voodoo curse, and endured disturbing hallucinations in which his food turned to worms and cigarettes became bones. His medication was altered, and he became more stable.

Beginning in March of 1995, Singleton was put on a voluntary treatment regime. He regularly accepted his medication until September of 1996, when a prison psychiatrist agreed to take him off the medication. Within a few months, Singleton was withdrawn and again lost a substantial amount of weight. His speech had become unintelligible. He was prescribed another antipsychotic medication, but did

not take it regularly. By July of 1997, Singleton's symptoms were much worse. Observations over the next few weeks have been summarized as follows:

> On July 21, 1997, Mr. Singleton was described as very hostile, belligerent, and probably psychotic. The following day, he informed the staff he was "on a mission from God," and he had to kill [treating physician] Dr. Oglesby and the President. On August 7, 1997, Mr. Singleton was described as bizarre, delusional, and he expressed the belief that he had been "freed by the Eighth Circuit and the U.S. Supreme Court." On August 7, 1997, Mr. Singleton was described as exhibiting bad hygiene. He informed the staff he was "God and the Supreme Court" and that he had been set free. On August 13, Mr. Singleton was observed in his cell by mental health staff. He was described as nude and "zombie-like." He displayed a vacant stare and was almost nonresponsive. He had torn up his mattress and flushed it. The following day, Dr. Oglesby recommended Mr. Singleton be seen by a Medication Review Panel, because he believed Mr. Singleton was psychotic and gravely disabled. On August 15, Mr. Singleton flooded his cell. He was seen on August 18 by the Medication Review Panel. He informed them he believed the courts had overturned his sentence and there was a conspiracy to execute him anyway.

(Mrad Dep. Ex. 1 at 9.) Based on Singleton's behavior, the panel again decided to forcibly medicate him. This medication alleviated Singleton's symptoms for a time, but by February of 1999 he was again withdrawn and exhibited a strange speech pattern. His medication was increased. In April of 1999, he reported that he was "hearing voices talking about doing something to him." (Id. at 11.) Again, the prison responded by increasing his medication.

In March of 2000, a panel of this Court ordered a limited remand to determine issues surrounding Singleton's competency to be executed. As a result, the district court ordered an evaluation to be performed on Singleton at the Federal Medical Center in Springfield. Singleton was held for observation from June 29, 2000 through August 14, 2000. During that time, he was interviewed a number of times

by Dr. Mrad, a psychologist in the Forensic Evaluation Unit. Dr. Mrad had seen Singleton in 1995 for a similar evaluation, giving him some point of reference as to Singleton's mental state.

During this evaluation period, Singleton's comments to Dr. Mrad led Dr. Mrad to question whether Singleton might be psychotic even while on his medication. Singleton admitted to having continued hallucinations, and "occasionally referred to himself as God or God-like and on a few occasions referred to himself as the Holy Spirit." (Mrad Dep. at 21.) Regarding Singleton's understanding of his punishment, Mrad stated:

> I asked him if he was God, how could he be executed, and he slapped his arm and said I've got this. My understanding referring to a body. He could be -- he could be executed and that it would - - and I think he knew that the reason for the execution would be conviction for the murder of Mary Lou York and by that I believed he had a factual understanding. He could recite -- basically recite basic facts that he would be -- what the sentence was and why he would be given that sentence.
>
> The other part of it, the rational understanding I think was -- has more to do with does he actually understand what this means, not only can he say it but does he actually understand what this means and what it means as applied to him, and it was not at all clear to me that he did. His thinking was so disorganized. He made these frequent comments about being the Holy Ghost or Holy Spirit. He talked about a -- some beliefs about a parallel world, about being -- an execution just being stopping breathing and then you start up again somewhere else and that -- there was some statement made about correctional officers. Execution correctional officers stop you from breathing and then the judge can do something to start it up again.

-22-

(Id. at 33-34 (emphasis added).) Singleton explained that he had attempted to kill himself in 1997 and had cut his jugular vein, but that he was unable to die because the wound spontaneously stopped bleeding. There is no evidence in the record of any such suicide attempt. Singleton went on to tell Dr. Mrad that he was penning a book at the request of God, that he and St. John were on a mission to fight homosexuals, and that Sylvester Stallone and Arnold Schwartzenegger were somewhere between this universe and another one and were trying to save him.

When asked about Singleton's current mental status, Mrad stated he would technically classify Singleton as "psychotic because he was describing that he was still experiencing hallucinations, and clearly when I had interviewed him his mental status was noticeably different than it had been, for instance, five years earlier. His thinking was much more disorganized. He was very difficult to follow." (Id. at 29.) In summary, Dr. Mrad determined that Singleton was not competent under the Ford[6] standard when he was off his medication in 1997, and that he would clearly be psychotic if his medication was discontinued. He further opined that Singleton's current concept of death was not a rational one, and that "he may not be currently competent from what I was seeing." (Id. at 46.)

There is some question of the cause of Singleton's psychosis during his observation period in the summer of 2000. Singleton did not take his medication in April of 2000, and Dr. Mrad thought that may have contributed to Singleton's behavior. However, Mrad also stated that disorders such as Singleton's often get worse with time. (See id. at 47 ("Generally, the disorder is chronic and usually lifelong and, if anything, a more common pattern would be to become more severe over time and that frequently as a patient has additional decompensations they often -- once they're medicated, once their mental status is restored, they may not come back to the prior level of functioning they had before the last decompensation . . . .").)

---

[6]Ford v. Wainwright, 477 U.S. 399 (1986).

-23-

On December 11, 2001, this Court received a letter directly from Singleton. In it, he declared that he did not believe Mary Lou York was dead, and that she "is somewhere on this earth waiting for me - her groom." (Letter from Singleton to Court of December 7, 2001, at 1.) He further stated that "[s]omebody sent me, the robot, to Mrs. York, I know the police is in it, you could be in it. So, if her service was/is in vain, its because that's the way you want it." (Id. at 2.)

## II.

## A.

In Ford v. Wainwright, 477 U.S. 399 (1986), the Supreme Court was faced with the question of whether the Eighth Amendment prohibition on cruel and unusual punishment proscribed the execution of insane prisoners. Ford was a death row inmate who suffered from serious mental illness. Id. at 402. As a result of his disease, Ford began to refer to himself as a religious leader, believed he had appointed new justices to the Florida Supreme Court, and began to speak in a strange alphanumeric code. Id. at 402-03. Importantly, Ford was also under the impression that he was no longer subject to the death penalty, and could leave the prison whenever he wanted to do so. Id. at 403.

Justice Marshall outlined the historical contours of the prohibition on executing the insane. Finding support as far back as Sir Edward Coke's seventeenth century treatise on the subject, the Court determined that while legislatures, courts, and commentators provided diverse rationales for the prohibition, they all agreed on one thing: execution of the insane does not comport with the ideals of a civilized society. Id. at 408-10. Consistent with this historical principle, the Court held that "the restriction [on executing the insane] finds enforcement in the Eighth Amendment." Id. at 410. Justice Powell, in his concurrence, suggested that if the insane inmate becomes "cured of his disease, the State is [then] free to execute him." Id. at 425 n.5.

The issue left unresolved by Ford is the very one in this case: whether the Eighth Amendment permits the execution of an insane inmate who is receiving treatment. At the outset, I believe that our analysis should consider what precisely "treatment" means in this context. Singleton has been forced to take antipsychotic medication, the stated goal of which is to stabilize his mental condition. However, receiving treatment is not synonymous with being cured. Antipsychotic drugs "merely calm and mask the psychotic symptoms which usually return to debilitate the patient when the medication is discontinued." State v. Perry, 610 So.2d 746, 759 (La. 1992); Keith Alan Byers, Incompetency, Execution, and the Use of Antipsychotic Drugs, 47 Ark. L. Rev. 361, 377 (1994) (noting consensus in medical community that antipsychotic drugs provide only temporary relief); see also Rhonda K. Jenkins, Comment, Fit to Die: Drug-Induced Competency for the Purpose of Execution, 20 S. Ill. U. L.J. 149, 169 (Fall, 1995) ("A subset of psychotropic medications, psychoactive drugs diminish the symptoms of mental illness, but they do not cure the underlying mental illness."); Nancy S. Horton, Comment, Restoration of Competency for Execution: Furious Solo Furore Punitur, 44 Sw. L.J. 1191, 1204 (Winter, 1990) ("Despite their beneficial effects, antipsychotic drugs merely mask the debilitating symptoms of major mental disorders; the drugs do not cure the mental disorder.")

Thus, when antipsychotic medication results in an improved mental state, the patient is merely displaying what has been termed "artificial" or "synthetic" sanity. Byers, supra, at 377; Horton, supra, at 1203-04. One of the pitfalls of equating true sanity with its medically-coerced cousin is that drug-induced sanity is temporary and unpredictable: "the effect of psychoactive drugs on a particular recipient is uncertain; the drugs may affect the same individual differently each time they are administered." Jenkins, supra, at 170.

Singleton's case is exemplary of the unpredictable result antipsychotic drug treatment has on mentally ill prisoners. A review of the record establishes that since the outset of the Singleton's symptoms, the treatment plan for his mental disease has

been consistently fluid. Singleton's medication has often been changed, either in dose or in type, in response to observations of his mental stability. Even when evaluated by Dr. Mrad pursuant to our court order, Singleton's behavior left Dr. Mrad with the impression that Singleton had decompensated and was currently psychotic, in spite of his treatment plan. Particularly because Singleton's treatment plan has never kept him consistently free of symptoms, "it would be very difficult to ensure that the prisoner was truly free of the effects of his psychosis and able to meet the [Ford] standard of competency at the exact moment of his execution." Byers, supra, at 377.

Based on the medical history in this case, I am left with no alternative but to conclude that drug-induced sanity is not the same as true sanity. Singleton is not "cured;" his insanity is merely muted, at times, by the powerful drugs he is forced to take. Underneath this mask of stability, he remains insane.[7] Ford's prohibition on executing the insane should apply with no less force to Singleton than to untreated prisoners.[8]

---

[7]Singleton, in fact, exhibits some of the very same manifestations of psychosis that Ford himself did, including a belief that his sentence has been overturned and that he cannot be executed.

[8]There is also some question as to whether forcing Singleton to take medication that will lead to his execution is violative of the Eighth Amendment's prohibition against excessive punishment. Cf. Atkins v. Virginia, 122 S.Ct. 2242, 2246 (2002) ("The Eighth Amendment succinctly prohibits 'excessive' sanctions.") Two state supreme courts, under their state constitutions, found such punishment to be excessive and thus unconstitutional. See generally, Singleton v. State, 437 S.E.3d 53 (S.C. 1993); State v. Perry, 610 So.2d 746 (La. 1992). The Supreme Court has recognized the potentially debilitating side effects of psychotropic medication. Washington v. Harper, 494 U.S. 210, 229-30 (1990). It has been recognized that forcibly medicated condemned inmates have to endure greater suffering than the typical condemned inmates, Perry, 610 So.2d at 766-68, and it is not beyond reason to suggest that the "evolving standards of decency that mark the progress of a

## B.

It is beyond dispute that the forcible injection of psychotropic medication into a person's body represents a substantial interference with that person's liberty. Riggins v. Nevada, 504 U.S. 127, 134-35 (1992) (citing Washington v. Harper, 494 U.S. 210, 229 (1990)). The Court recognized that while such drugs often benefit the recipient, "it is also true that the drugs can have serious, even fatal, side effects." Harper, 494 U.S. at 229. For this reason, forcing a prisoner to take antipsychotic drugs is "impermissible absent a finding of overriding justification and a determination of medical appropriateness." Riggins, 504 U.S. at 135. Specifically, the Due Process clause of the Fourteenth Amendment requires the State to show that the mind-altering medication is 1) necessary because the inmate is dangerous to himself or others, and 2) in the inmate's best medical interest. Harper, 494 U.S. at 227.[9]

The question for our court is whether Harper is satisfied where the consequence of forcibly medicating the inmate will be his execution. The majority believes that its analysis should focus on the State's intent in medicating the inmate, and concludes that it is constitutional for the State to forcibly medicate Singleton into a state of competency because the State's motive in medicating Singleton is to improve his well-being.

---

maturing society" do not permit such a distinction, Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion),

[9]As in Harper, I consider it obvious that a determination of what is in the inmate's best medical interest must be made by a licensed care provider, such as a doctor or psychiatrist. Harper, 494 U.S. at 221-22.

Even if I were to accept that the State's intent should control the analysis, the majority's reasoning remains unsound. It is beyond dispute that the State may not execute Singleton when he is unmedicated and displays the typical symptoms of his psychosis. Ford v. Wainwright, 477 U.S. 399, 409-10 (1986). It is also true, as the majority states, "[t]hat the government has an essential interest in carrying out a lawfully imposed sentence cannot be doubted." Ante at 9. The State's vigor in pursuing this goal may well lead it to obscure the true reasons for forcibly medicating an inmate into competence.[10] See Bryan Lester Dupler, The Uncommon Law: Insanity, Executions, and Oklahoma Criminal Procedure, 55 Okla. L. Rev. 1, 54 (Spring 2002) ("As a matter of candor and common sense, the long-term health (or 'medical interest') of the insane capital prisoner is not the concern of the State that seeks to forcibly medicate him."); Roberta M. Harding, "Endgame": Competency and the Execution of Condemned Inmates–A Proposal to Satisfy the Eighth Amendment's Prohibition Against the Infliction of Cruel and Unusual Punishment, 14 St. Louis U. Pub. L. Rev. 105, 125 (Fall, 1995) (noting that "there is a real risk that a state might cite an 'appropriate' reason for forcible medication, such as providing medical care as required by the Eighth Amendment, while refusing to disclose the real reason, wanting to make the inmate death qualified"); cf. State v. Perry, 610 So. 2d 746, 761 (La. 1992) (refusing to accept State's "manufactured" justification that forcibly medicating capital inmate into competence was appropriate because it also made inmate less dangerous); Rhonda K. Jenkins, Comment, Fit to Die: Drug-Induced Competency for the Purpose of Execution, 20 S. Ill. U. L. J. 149, 175 (Fall, 1995) ("Perry pointed out that the state could not credibly come forward with a request to forcibly administer antipsychotic drugs to a death row inmate and claim the

_____

[10]The State conceded in its brief and at the initial oral argument in this matter that it may not medicate Singleton for the express purpose of rendering him competent for execution.

involuntary medication was in the inmate's medical interest when the state has condemned the inmate to death.")[11]

The problem with pinning the constitutionality of a prisoner's execution to the State's intent in forcibly medicating him is that it will often be difficult to determine whether the State is medicating a prisoner to protect him from harming himself or others, or whether the State is medicating the inmate to render him competent for execution. Moreover, such an inquiry rests on the faulty assumption that the State maintains one exclusive motive for its actions. Here, even the majority recognizes two competing State interests: the safety of the prison guards and inmates (including Singleton), and its interest in exacting punishment. In light of the record, it is simply illusory for our court to conclude that it can discern the State's single, directed motivation for forcibly medicating Singleton. See Harding, supra, at 125 (noting it is "extraordinarily difficult, if not impossible, to decipher the state's motivation" in this situation); see also Keith Alan Byers, Incompetency, Execution, and the Use of Antipsychotic Drugs, 47 Ark. L. Rev. 361, 381 (1994) (recognizing the "problem of determining the true motive behind an attempt to medicate an inmate" is one without a workable solution).

Once an execution date was set, I believe that the justification for medicating Singleton under Harper evaporated. An inquiry into the State's motivation is unhelpful, for it presupposes a single, directed motivation, which is not the case here. In fact, the evidence suggests two competing interests: the welfare of the prison, and

---

[11]Unlike the majority, I am not convinced that forced medical treatment is in Singleton's best medical interest when it may ultimately result in his execution. See Jenkins, supra, at 162 (noting that, among others, American Psychiatric Association has argued "it matters little if the drugs benefit the prisoner in the short term when the overall effect of the drug treatment is his ultimate death.")

the execution of the prisoner's sentence.[12]  At the very least, the setting of an execution date calls into question the State's true motivation for administering the medication in the first instance.  The circumstances of Singleton's case changed once the execution date was set, and changed in such a way that Harper no longer supports the prison forcing him to take medication.

## C.

Lastly, I am compelled to note that the majority holding will inevitably result in forcing the medical community to practice in a manner contrary to its ethical standards.  Physicians are duty bound to act in the best interest of their patients.  See Perry, 610 So.2d at 752 ("Under [the Hippocratic Oath], the physician pledges to do no harm and to act only in the best medical interests of his patients.")  Consequently, the ethical standards of both the American Medical Association and the American Psychiatric Association prohibit members from assisting in the execution of a condemned prisoner.  Singleton, 437 S.E.2d at 61; Perry, 610 So.2d at 752-53.  Needless to say, this leaves those doctors who are treating psychotic, condemned prisoners in a untenable position: treating the prisoner may provide short-term relief but ultimately result in his execution, whereas leaving him untreated will condemn him to a world such as Singleton's, filled with disturbing delusions and hallucinations.

The ethical dilemma outlined above is not simply a policy matter; courts have long recognized the integrity of the medical profession as an appropriate consideration in its decision-making process.  In Washington v. Glucksberg, 521 U.S. 702 (1997), the Supreme Court considered the whether a statute outlawing physician-

---

[12]I reiterate this point not to question the State's veracity, but only to underscore that carrying out an inmate's sentence is typically of tremendous importance to the State; it has been fighting to put Singleton to death since 1979.

assisted suicide was constitutional. It noted that the American Medical Association and other physician groups had condemned the practice. Id. at 731. The Court explicitly recognized the significance of this factor, giving credence to the State's "interest in protecting the integrity and ethics of the medical profession." Id. at 731; see also Harper, 494 U.S. at 222 n.8 (citing American Psychiatric Association's ethical code in support of holding).

I see no reason for the majority's divergence from the Supreme Court in this matter. Here, as in Glucksberg, the medical community has spoken with a singular voice, opposing its members' assistance in executions. Instead of giving due consideration to this serious issue, the majority eschews it altogether, without so much as an acknowledgment of the dilemma it has created. I adhere to the Supreme Court's position that the integrity of the medical profession is an interest that the court should consider and protect.

## III.

Charles Singleton is an insane death row inmate. He is forced to submit to a treatment regime that includes powerful, mind-altering drugs. As a result of his treatment, he sometimes appears lucid and rational; other times he does not. The fact is, however, that he remains insane. I believe that we must continue to abide by the Supreme Court's prohibition on executing the insane, particularly in this case, where the State is motivated to medicate a person into competence in order to carry out its punishment. I am gravely concerned that the majority has created a serious ethical dilemma for the medical community as a result of its opinion. I would hold that the State may continue to medicate Singleton, voluntarily or involuntarily, if it is necessary to protect him or others and is in his best medical interest, but it may not execute him. I continue to believe that the appropriate remedy is for the district court to enter a permanent stay of execution. Accordingly, I have no alternative but to dissent.

-31-

MURPHY, Circuit Judge, dissenting, in which McMILLIAN, Circuit Judge, joins.

This case presents important and difficult issues, and I write separately because I conclude that the record before us does not lend itself to proper resolution of them. Singleton was examined at Springfield in the summer of 2000, and the district court used this evaluation in making its findings about his mental condition and the status of his treatment. The dissent asserts that Singleton continues to be psychotic, and I find the record unclear in this respect.

Each of the opinions by my esteemed colleagues reflects impliedly, if not explicitly, the underlying problem we face by proceeding to rule on the critical issues based on the current record. Judge Wollman points out that the "posture of this case has changed during the course of this appeal", ante at 6, but concludes that the merits should be reached since "the combination of a Harper order and a scheduled date of execution will likely occur in the future." Id. Because of the uncertainties related to Singleton's mental condition and the fact that medication could again be administered to him involuntarily, Judge Heaney concludes in dissent that a permanent stay of execution is appropriate. Finally, Judge Loken, writing separately, shows the difficulty in raising a Ford claim if a petitioner's condition has changed after his initial §2244 petition, and he proposes possible solutions the Supreme Court might adopt.

The court has proceeded to rule on the merits by concluding that the petition is neither "second nor successive" and by finding that an exception to the mootness doctrine applies, but the posture of the case is such that the decision must be based on an assessment of what is likely to occur in the future. For that reason, I respectfully dissent. I find myself unable to join in the judgment foreseen by the majority, particularly in light of the fact that the Supreme Court has granted certiorari in United States v. Sell. Similarly, I cannot join in the dissent's permanent stay when it is possible that Singleton will regain mental health. Since I believe the issues are

too important to permit a decision on the merits on the basis of this record, I would dismiss the petition as moot or premature.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.